NATIONAL ASSOCIATION OF POST-
MASTERS OF THE UNITED
STATES, Appellant,

v.

HYATT REGENCY WASHINGTON
Appellee.

No. 04–CV–1112, 04–CV–1343.

District of Columbia Court of Appeals.

Argued Jan. 10, 2006.
Decided March 16, 2006.

Christine N. Kearns, Washington, with whom Matthew A. Anzaldi was on the brief, for appellant.

Frederic W. Schwartz, Jr., with whom Bart F. Higgins, and Jamil N. Alibhai were on the brief, for appellee.

Before SCHWELB and FISHER, Associate Judges, and STEADMAN, Senior Judge.

FISHER, Associate Judge:

In this contract dispute, the National Association of Postmasters of the United States (NAPUS) and Hyatt Regency Washington (Hyatt) each sought summary judgment in relation to the cancellation of two NAPUS conferences to be held at Hyatt. The trial court granted judgment for Hyatt, holding that NAPUS was not permitted to cancel the conferences without paying liquidated damages because it had not given notice within the time limits established by the contract. We affirm the trial court's ruling, on alternative grounds, and uphold the award of attorneys' fees. Because the amount of pre-judgment interest was miscalculated, we remand the case to correct that error.

## I.

This dispute arose from a multi-year contract in which Hyatt agreed to provide blocks of rooms and other amenities for the annual leadership conference held by NAPUS. The contract, entered into in February of 2001, set specific dates for the 2002, 2003, and 2004 conferences. In each of those years, the gathering was to be held in mid-February, as it had been for many years.

After this contract was executed, a federal arbitrator, ruling on a collective bargaining agreement between two entities not parties to this appeal or the underlying suit, ordered the U.S. Postal Service to move the 2003 and 2004 Rural Mail Count[1] from its usual time in September to a new time in February. The dates selected by the arbitrator, February 15 through March 15, 2003, and February 14 through March 6, 2004, substantially conflicted with the dates of the 2003 and 2004

---

[1]. As NAPUS explains, "[t]he Rural Mail Count measures the volume of mail delivered along the nation's rural mail routes and the effort required to perform various tasks nec- essary to deliver that mail. The results of the Rural Mail Count determine the compensation paid to rural mail carriers."

leadership conferences, which were to be held February 12–21, 2003, and February 11–20, 2004.

Because postmasters play a central role in conducting the Rural Mail Count, this newly-emerged conflict at the very least made it inadvisable to hold the leadership conferences for 2003 and 2004 on the dates previously scheduled. NAPUS learned of the change in dates and resulting conflict on February 4 or 5, 2002, and it verified on February 17, 2002, that a substantial number of postmasters would be unable to attend the 2003 and 2004 conferences due to the conflicting obligation. On February 7, 2002, NAPUS orally informed the Hyatt that there was a conflict with the 2003 and 2004 leadership conference dates. On February 8, NAPUS began exchanging e-mails with Hyatt in an attempt to identify new dates for the conference. Hyatt indicated that it would charge increased rates for the days it proposed, but NAPUS was unwilling to pay those increased rates. Unable to find dates and prices that fit, NAPUS sent a letter on February 25, 2002, terminating the contract for 2003 and 2004.

NAPUS sought a declaratory judgment absolving it of any liability for terminating the contract, relying upon a "For Cause" cancellation clause and also asserting the impracticability of performance. Hyatt counter-sued for liquidated damages under the "Cancellation Option" and sought attorneys' fees and costs. Both parties moved for summary judgment, and the Superior Court granted judgment in favor of Hyatt, finding that NAPUS owed liquidated damages in the amount of $257,617 because it did not strictly comply with the notice requirements of the "For Cause" cancellation clause.

## II.

■■■ "In reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion." *Croce v. Hall,* 657 A.2d 307, 309–10 (D.C. 1995). "We therefore must determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. We view the record in the light most favorable to the non-moving party." *Childs v. Purll,* 882 A.2d 227, 233 (D.C.2005). We can affirm the judgment on a different ground if "the appellant [will] suffer[ ] no procedural unfairness—that is, [if][it] had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto." *In re Walker,* 856 A.2d 579, 586 (D.C.2004) (per curiam). Where there will be no procedural unfairness, "we may affirm a judgment on any valid ground, even if that ground was not relied upon by the trial judge or raised or considered in the trial court." *Id.* (citing *In re O.L.,* 584 A.2d 1230, 1232 (D.C.1990)). The requirement of procedural fairness is satisfied here, because the ground on which we rely was raised in the trial court and fully debated before us.

■■■ "[S]ummary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983). Although the parties have engaged in a spirited debate about the meaning of their agreement, "[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Id.* Moreover, a contract "is not ambiguous where the court can deter-

mine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Id.* (internal quotation marks and citation omitted). Our analysis reveals that the remaining factual disputes are not material and that this case therefore was ripe for summary judgment.

## A. *Cancellation of the Contract*

Two cancellation provisions in the contract are at the center of controversy in this case. The first of these is a "Cancellation Option." It allows either party to cancel the contract upon written notice to the other, but requires the cancelling party to pay liquidated damages in the amount found in an accompanying graduated scale:

> [e]ither the Hotel or the Group may cancel any one or all of the dates stated as "definite" in this contract without cause upon written notice to the other party at any time prior to the arrival of the event room block and upon payment of an amount based on the [graduated] scale.

Hyatt claims that NAPUS' cancellation falls within this broad provision. NAPUS, on the other hand, claims that the rescheduling of the Rural Mail Count created an emergency it could not foresee and, therefore, the cancellation of the conference falls within the "For Cause" provision. The "For Cause" clause is much narrower than the "Cancellation Option," but permits cancellation without liability:

[t]he parties' performance under this Contract is subject to acts of God, war, government regulation, terrorism, disaster, strikes, civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties' control, making it inadvisable, illegal or which materially affects a party's ability to perform its obligations under this Contract. Either party may terminate this Contract for any one or more of such reasons upon written notice to the other party within three (3) days of such occurrence or receipt of notice of any of the above occurrences.[2]

■ NAPUS asks us to hold that the rescheduling of the Rural Mail Count is covered by the "For Cause" cancellation clause. If that clause applies, we then must decide whether NAPUS gave proper and timely notice in compliance with the contract. We conclude that the rescheduling of the Rural Mail Count was not covered by the "For Cause" cancellation provision and, therefore, need not reach the second issue.

The "For Cause" clause begins by enumerating several circumstances in which the contract can be cancelled for cause: "acts of God, war, government regulation, terrorism, disaster, strikes, civil disorder, [and] curtailment of transportation facilities." NAPUS does not argue that the rescheduling of the Rural Mail Count falls within any of these specifically enumerated categories.[3] It does contend, however, that this change of circumstances fits with-

---

**2.** Such provisions are often called *force majeure* clauses, but attaching that label does not assist in our analysis. We still must "look to the language that the parties specifically bargained for in the contract to determine the parties' intent concerning whether the event complained of excuses performance." *Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1248 n. 5 (5th Cir.1990).

**3.** NAPUS does claim that the rescheduling of the Rural Mail Count by the federal arbitrator was a "government mandate[ ] of the 'same type' as the 'government regulation' set forth in the Agreement." Nevertheless, it is not a government regulation, so it is not one of the events enumerated in the contract. Nor, as we explain below, does the arbitrator's ruling constitute "any other emergency."

in the residual category of "any other emergency beyond the parties' control, making it inadvisable, illegal or which materially affects a party's ability to perform its obligations under this Contract."

■ We decline to interpret the "any other emergency" provision so broadly. A common aid for interpreting both statutes and contracts is *ejusdem generis:* "Where general words follow specific words in a[n] ... enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Edwards v. United States,* 583 A.2d 661, 664 (D.C. 1990) (citing 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 47.17, at 166 (4th ed.1984)); *see also Lang v. F.G. Arwood & Co.,* 65 A.2d 194, 196 (D.C.1949) (applying the doctrine to contract interpretation); BLACK'S LAW DICTIONARY 556 (8th ed. 2004) ("[W]hen a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed.").

■ The events specifically enumerated in the "For Cause" clause of the contract are qualitatively different from the rescheduling of the Rural Mail Count. It was not a war, an act of God, or an act of terrorism; it was not a strike, civil disorder, or a curtailment of transportation facilities. This unexpected conflict of schedules was not "of the same kind" as the events listed. It would excuse the payment of liquidated damages only if it qualifies as "any other emergency" under the residual exception. However, the word "emergency" describes an unexpected development urgently requiring a prompt response, not one where the effects will be felt in a year's time or two years' time. *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 427 (1994) (defining "emergency" as "[a]n unexpected, serious occurrence or situation *urgently* requiring prompt action" (emphasis supplied)); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 602 (3d ed.1992) (defining "emergency" as "a serious situation or occurrence that happens unexpectedly and demands immediate action"). NAPUS learned of the rescheduling of the Rural Mail Count a full year in advance of the 2003 leadership conference and two years in advance of the 2004 leadership conference. The rescheduling of the Rural Mail Count may be an inconvenience or even make compliance with the contract inadvisable, but without an urgent need for prompt reaction, it cannot be considered an "emergency" as that term is properly understood.[4]

■ During oral argument, NAPUS suggested that the rescheduling was inherently urgent because prompt action was required under the "three day written notice" provision. If this kind of urgency were enough, however, then *every* unforeseen event making compliance with the contract inadvisable would be an emergency. Under this theory, it is not the unforeseen event, but rather the contract itself and the desire to avoid paying liquidated damages that create the "emergency." This interpretation would render the "Cancellation Option" superfluous, as it is human nature to want to avoid paying liquidated damages and any reason for cancellation would become an "emergency"

---

4. Indeed, NAPUS devotes much of its brief to arguing that the conflict made it "inadvisable" to hold the leadership conference on the dates previously scheduled or "materially affect[ed]" its ability to do so. This may be true, but it is not sufficient. In order to invoke the "For Cause" clause, NAPUS must also demonstrate that the conflict was either an enumerated event or "any other emergency."

requiring prompt reaction. We therefore conclude that the "Cancellation Option" applies and that NAPUS owes Hyatt liquidated damages according to the graduated chart found in the contract.[5] We affirm the ruling of the trial court to that effect.

### B. *NAPUS' Request to Amend Its Complaint*

NAPUS next contends that the trial judge abused her discretion when she denied its motion for leave to amend its complaint. Super. Ct. Civ. R. 15(a) provides, in part, that after an answer has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." This rule places the decision of whether to grant leave to amend a complaint squarely within the discretion of the trial court. *Pannell v. District of Columbia*, 829 A.2d 474, 477 (D.C.2003). The factors the trial court should consider are: "(1) the number of requests to amend; (2) the length of time that the case has been pending; (3) the presence of bad faith or dilatory reasons for the request; (4) the merit of the proffered amended pleading; and (5) any prejudice to the non-moving party." *Id.* (internal citation omitted).

NAPUS asked leave to amend its complaint so that it could plead an additional ground which allegedly justifies cancellation of the 2003 conference. It sought to argue that the blizzard of February 2003, an "act[ ] of God" that "curtail[ed] transportation facilities" would, in any event, have constituted "cause." The trial court recognized, however, that the blizzard started a few days after the 2003 leadership conference would have begun. Therefore, the contract "would have been breached days before the snowstorm occurred." *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 254(2) (1981) ("A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that the duty that he repudiated would have been discharged by impracticability or frustration *before* any breach by non-performance." (emphasis added)). Finding "the merit of the proffered amended pleading to be completely lacking," the court denied leave to amend. We also think it would be impermissibly speculative to permit NAPUS to rely upon the vagaries of the weather in 2003 to justify actions it had taken nearly a year earlier.

NAPUS claims it was an abuse of discretion for the trial court to rely so heavily upon the perceived lack of merit of this newly-proffered justification when it denied the motion for leave to amend. It also argues that this is a "substantive issue" that should be reserved for "proceedings on the merits." *See Karr v. C. Dud-*

---

5. NAPUS argues, in the alternative, that cancellation was permitted by the common law doctrine of commercial impracticability. To establish commercial impracticability, a party must show (1) the unexpected occurrence of an intervening act; (2) the risk of the unexpected occurrence was not allocated by agreement or custom; and (3) the occurrence made performance impractical. *Transatlantic Fin. Corp. v. United States*, 124 U.S.App. D.C. 183, 186, 363 F.2d 312, 315 (1966); *see also Duffy v. Duffy*, 881 A.2d 630, 639 (D.C.2005) (recognizing the doctrine of commercial impracticability in contracts). In the instant agreement, however, the contract has allocated the risk for every situation in which a party cancels. For those reasons that are enumerated or otherwise constitute an "emergency," the parties have determined that both share the risk. For all other reasons, the risk is allocated to the cancelling party. That is the very point of the "Cancellation Option" and liquidated damages chart. As the situation presented here fails to meet the second prong of the commercial impracticability test, this doctrine does not excuse NAPUS' refusal to pay damages according to the "Cancellation Option."

*ley Brown & Assocs.*, 567 A.2d 1306, 1311 (D.C.1989). This argument ignores the governing test, which explicitly authorizes the court to consider the merits of the proposed amendment. *See Pannell*, 829 A.2d at 477. *See also Sherman v. Adoption Ctr. of Washington, Inc.*, 741 A.2d 1031, 1038 (D.C.1999) ("The court appropriately included in its calculus the apparent lack of merit in the amended complaint . . . ."). We cannot hold that there was an abuse of discretion when the trial judge did what the relevant legal test allowed her to do.

### C. *Attorneys' Fees and Interest*

■ Finally, NAPUS asks us to overturn the trial judge's award of attorneys' fees and pre-judgment interest. Hyatt was awarded $178,100 for attorneys' fees, $52,553.86 in interest, and $3,486.70 in costs. NAPUS argues that it was unreasonable for Hyatt to devote 450.5 hours of attorney time to litigating the summary judgment motions when its own attorneys spent only 158.6 hours, or 35% of that time. NAPUS urges us to adopt a "mirror-image" comparison, where Hyatt's attorneys would be allotted the same number of hours that NAPUS' attorneys spent on the same matter, thereby reducing the attorney fee award to 35% of the requested amount. NAPUS further protests that hours spent on an Illinois action between the same parties should not have been included in the award.[6]

■ We review awards of attorneys' fees for abuse of discretion, *Talley v. Varma*, 689 A.2d 547, 555 (D.C.1997), and no abuse has been shown here. The contract provides that "[NAPUS] shall be responsible for payment of attorneys' fees and interest associated with [Hyatt's] efforts to collect monies owed under the terms of this Agreement." Thus the trial judge was authorized to award the fees. Furthermore, NAPUS has cited no legal precedent requiring, or even suggesting, the "mirror-image" test it urges. Given Hyatt's complete success on the merits, it is neither unreasonable nor an abuse of discretion for the trial judge to conclude that Hyatt's attorneys had appropriately spent more time litigating this matter.

■ Hyatt argues that, since the claims were the same in both jurisdictions, the hours spent on the Illinois action were justified regardless of where litigation was ultimately conducted. The tasks performed included pre-filing investigation, research, and drafting of claims which ultimately became counterclaims. We make three additional observations. First, although NAPUS is incorporated under Illinois law, it opposed conducting the litigation in Cook County, and is therefore responsible for shifting the dispute to the District of Columbia. Second, the contract allows Hyatt to recover fees incurred enforcing the terms and conditions of the agreement. Its right to do so is not contingent upon the litigation being conducted in a single jurisdiction. Third, Hyatt reviewed its own billing records and voluntarily reduced by $23,000 the amount of attorneys' fees it was seeking. Considering all of these factors, it was not an abuse of discretion to award $178,100 in attorneys' fees.

---

6. Hyatt originally filed an action as a plaintiff in Cook County, Illinois. Although Hyatt is based in Illinois and NAPUS is incorporated in Illinois, NAPUS claimed Illinois was an inconvenient forum, and moved for dismissal on that ground. NAPUS simultaneously filed its own action in our Superior Court. The Circuit Court of Cook County granted NAPUS' motion to dismiss. Rather than appeal the Cook County ruling, Hyatt answered the Superior Court suit and asserted its original claims as counterclaims.

The award of interest must be modified, however, because it was calculated on the basis of a legal error as to the applicable rate. *See In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991) ("[A] trial court abuses its discretion when it rests its conclusions on incorrect legal standards." (citations omitted)). The parties agree that pre-judgment interest should have been calculated at 6% per annum. Nevertheless, Hyatt had, in its original accounting and without explaining its calculations, asked for $52,553.87 in interest. After NAPUS objected to its accounting, Hyatt admitted that it had made a mathematical error. Interest should be awarded in the amount of $37,774.40. Both parties agree with this calculation and, therefore, the interest award should be reduced accordingly.

## III.

We affirm the trial court's ruling on the merits, its refusal to permit NAPUS to amend the complaint, and its award of attorneys' fees and costs. We conclude that the award of interest should be adjusted, and therefore remand the case to the trial court with instructions to amend the judgment accordingly.

*So ordered.*