Angel MILLER–McGEE, Appellant,

v.

WASHINGTON HOSPITAL CENTER,
et al., Appellees.

No. 05–CV–1303.

District of Columbia Court of Appeals.

Argued Dec. 18, 2006.
Decided April 12, 2007.

Gregory L. Lattimer, Washington, DC, for appellant.

Joan F. Brault, with whom Stuart N. Herschfeld, Rockville, MD, was on the brief, for appellees.

Before FISHER, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Appellant Angel Miller–McGee sustained an extensive tear of her perineum during a forceps-assisted vaginal delivery of her first child and thereafter suffered fecal incontinence, necessitating a series of corrective surgeries. She appeals from the trial court's order dismissing, with prejudice, the action in which she sought to pursue a claim that the defendant hospital and obstetrician performed the assisted delivery without her informed consent. The trial court dismissed the action on the ground that Miller–McGee had failed to amend her complaint to add the lack of informed consent claim after the court had dismissed her other claims. In light of the procedural history of this case, we hold that the trial court abused its discretion in dismissing the suit without affording Miller–McGee an opportunity to amend her complaint. We therefore reverse and remand.

## Factual and Procedural Background

On September 1, 2000, appellant gave birth to a baby girl at the Washington Hospital Center. During the delivery, she suffered a large tear of her vagina that was caused by her baby being pulled through her vaginal canal with forceps. The tear developed into a rectovaginal fistula,[1] causing appellant to have uncontrollable bowel movements through her vagina. She underwent two surgical procedures to correct the problem. On October 31, 2003, she filed a two-count amended complaint in the Superior Court against defendants/appellees Washington Hospital Center Corporation and Dr. Scott Muangman,[2] alleging medical malpractice-negligence (Count I) and negligent infliction of emotional distress (Count II).[3] The trial court dismissed

1. A rectovaginal fistula is "an abnormal passage or communication ... between the rectum and vagina." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 506 (26th ed. 1981).

2. It appears from the Superior Court docket sheet that Miller–McGee filed an original complaint on September 2, 2003, but never served that original complaint, and that appellees' first responsive pleadings were their answers to appellant's amended complaint.

3. In Count I of the amended complaint, Miller–McGee alleged that defendants owed her "the duty of providing appropriate diagnosis, care and treatment in accordance with the standard of care utilized by those of average knowledge and skill in the field of medicine," and that defendants' "failure to provide appropriate diagnoses and treatment constituted negligence and was the cause of the massive vaginal tear which she suffered and is the cause of the extreme pain, suffering and em-

Count II after defendants filed an unopposed motion to dismiss that count.

On February 14, 2005, defendants filed a motion for summary judgment, arguing that because Miller–McGee had no expert witness who would testify in the case,[4] she would be unable as a matter of law to establish the standard of care, a breach thereof, and proximate causation. On April 11, 2005, the trial court issued its order dismissing the negligent delivery claim. Noting that Miller–McGee contended that her injuries were caused by her child having been delivered forcibly with forceps, the court found that there was no question that expert testimony would have been required to determine the standard of care and to establish what constituted the proper use of force in the delivery of a child. As to Miller–McGee's theory that appellees failed to obtain her informed consent to the assisted vaginal delivery that was performed, the court stated, "[w]hile Plaintiff's complaint fails to mention a lack of informed consent it is the Court's understanding that Defendants had notice of this theory, as evident by their Interrogatory Requests of Plaintiff.... Defendants were further put on notice of this theory during the deposition of Defendant Muangman, if not earlier." The court also found that an "expert opinion was not necessary for the Plaintiff's claim of lack of informed consent." Accordingly, the court's April 11, 2005 order granted only partial summary judgment to defendants, stating that "[p]laintiff may go forward with the lack of informed consent issue only."

On April 28, 2005, defendants/appellees filed another motion to dismiss and/or for summary judgment, asserting that Miller–McGee had not pled a claim of lack of informed consent in either her original or amended complaint and had not sought leave of court to amend her complaint a second time to add such a claim, and arguing that her "failure to amend her complaint to allege Lack of Informed Consent is fatal." Defendants/appellees also asserted that Miller–McGee "cannot prove her claim of Lack of Informed Consent as a matter of law." Defendants/appellees argued, and contend again in this appeal, that:

> Even if this Court could allow a late amendment, Plaintiff cannot prove that the risk of laceration is a material risk and that there was a viable alternative to an assisted vaginal delivery. Moreover, Plaintiff cannot prove that had she been informed of the risk of vaginal laceration, she would not have consented to the assisted vaginal delivery of her child. As demonstrated by the testimony of Defendants' expert witness, upon whom Plaintiff intends to rely to support her claim of Lack of Informed Consent, an expectant mother is not routinely given the option of a caesarian section. There must be a medical indication for surgery. In this case a caesarian section was not medically indicated. Therefore, the risk of laceration, and more specifically, rectovaginal tear, was not considered to be a material risk.... Accordingly, Plaintiff cannot prove that the risk of laceration was a material risk and that had she been so advised, she would not have consented to the assisted vaginal delivery of her child.

barrassment experienced throughout a two year period of her life." Amended Complaint, ¶¶ 9, 11.

**4.** Miller–McGee had designated an expert after the court extended the time for discovery,

but the expert was never made available for a deposition, and eventually the court granted defendants' unopposed motion to strike the expert.

In opposing the motion to dismiss and/or for summary judgment, Miller–McGee submitted an affidavit in which she stated that:

> Immediately prior to the delivery of my child at Washington Hospital Center, the birth of my child was discussed and I was specifically advised that because of the size of my unborn child, if there were any complications during the natural delivery process, a caesarian section would be performed. Because a caesarian was a real possibility, I was told that I needed to execute a consent form for that procedure prior to beginning the delivery as it may have needed to be performed without delay. As a result of my discussions, I was led to believe that I would either have a normal delivery or if complications arose, I would have a caesarian birth. At no time did anyone discuss a vaginally assisted birth with me, and at no time did anyone discuss with me the possibility of a recto-vaginal tear that could result from a vaginally assisted birth. No one advised me that as a result of a recto-vaginal tear that I could potentially lose control of my bowels and have uncontrollable bowel movements from my vagina. Had anyone informed me of this possibility, I would have vehemently objected to a vaginally assisted birth especially since I had already agreed to a caesarian if any complications arose during the delivery process.

Miller–McGee also attached to her opposition a copy of her responses to defendants'/appellees' interrogatories, in which she stated that she did "not have any specific discussions with anyone regarding the risks, benefits and alternatives of a vaginal delivery."

On September 30, 2005, the court granted defendants'/appellants' motion. Considering matters outside the pleadings and therefore treating the motion as a motion for summary judgment, the court stated that:

> [T]he Complaint did not state a claim for lack of informed consent. While defendants were put on notice, sometime afterward, of the "legal theory," the Plaintiff never formally amended the claim, nor sought leave from this Court to make the amendment even after the court's last ruling. Therefore, the issue is not now properly before this Court and should be dismissed.

The court did not reach defendants' contention that Miller–McGee's claim would fail as a matter of law, explaining that:

> The Court has already determined that it lacks jurisdiction for the claim of lack of informed consent because it was never pled. Therefore, the Court finds no reason, at this time, to make a legal determination as to whether the claim would have failed as a matter of law.

This appeal followed.

### Analysis

For the reasons that follow, we hold that the trial court abused its discretion in granting summary judgment to defendants without affording Miller–McGee an opportunity to amend her complaint to include a claim of lack of informed consent to the assisted vaginal delivery.[5]

### I.

■ Miller–McGee acknowledges that her amended complaint does not use the

---

**5.** Because the court's September 30, 2005 order granted summary judgment, our standard of review is *de novo*. *See Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281 (D.C.2002); *see also Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 562 (D.C. 2002) (reviewing *de novo* a dismissal for failure to state a claim).

words "informed consent." She argues, however, that her complaint "clearly alleges medical negligence, and lack of informed consent is a form of medical negligence," and she urges us to construe Count I of the amended complaint ("Medical Malpractice–Negligence") as broad enough to state a claim of lack of informed consent. Appellant's argument is not without support in our case law. Our cases hold that, on appeal from a dismissal for failure to state a claim, we "must construe the complaint in the light most favorable to the plaintiff." *Haymon v. Wilkerson,* 535 A.2d 880, 882 (D.C.1987). We have also recognized that our "liberal rules of pleading normally protect a plaintiff against dismissal of an ambiguous complaint when it can be said to state a claim if all reasonable inferences are drawn in plaintiff's favor." *Atraqchi,* 788 A.2d at 563 (internal quotations and citation omitted).[6] Furthermore, as appellant argues, there is a basis in our case law for treating a claim of lack of informed consent as a medical malpractice claim. *See Crain v. Allison,* 443 A.2d 558, 563–64 (D.C.1982).[7] And while, in our opinion, in *Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 558 (D.C.2001), we held that a claim of lack of informed consent related back to a claim

of medical negligence—thereby signaling that the two were separate claims—we arguably left open the question of whether the claim of lack of informed consent might reasonably be regarded as subsumed within the complaint's "general allegation of unspecified negligence in [plaintiff's] care and treatment." *Id.* at 557 n. 14.[8] Elsewhere, however, as appellees emphasize, we have pointedly distinguished between claims sounding in medical negligence and claims of lack of informed consent. *See, e.g., Cleary v. Group Health Ass'n,* 691 A.2d 148, 155 (D.C.1997) (distinguishing allegations of negligence in conveying inaccurate medical information from a claim of failure to obtain informed consent).

We decline to decide the narrow issue of whether the non-specific allegations pertaining to "medical malpractice-negligence" in Miller–McGee's amended complaint were sufficient to state a claim of lack of informed consent. We conclude instead that, taken together, our liberal pleading rules and the procedural history of this case provided a basis upon which Miller–McGee could reasonably regard her amended complaint as having sufficiently pled a claim of lack of informed consent.

---

6. Moreover, " '[t]he Superior Court Rules of Civil Procedure manifest a preference for resolution of disputes on the merits, not on technicalities of pleading.' " *Epps v. Vogel,* 454 A.2d 320, 325 n. 8 (D.C.1982) (quoting *Keith v. Washington,* 401 A.2d 468, 470 (D.C.1979)).

7. We observed in *Crain:*

Appellees testified that appellants failed to warn them of the risk of infection associated with cortisone injections before embarking on that course of treatment. We agree that the jury could find this was a material risk. Mrs. Allison testified that she would not have agreed to the injections had she been aware of the risk of infection. In fact, Mrs. Allison's finger did become infected as a result of the treatment, and Mrs. Allison

suffered pain from the infection. Although there was no expert testimony on the standard of care of a physician in obtaining informed consent from his patients, there was expert testimony on the actual risks involved. *Thus, appellees established a prima facie case of medical malpractice.*

443 A.2d at 563–64 (italics added).

8. Our discussion in *Wagner* was premised on the specificity of plaintiff's other allegations of negligence ("defendants' alleged failures during surgery to monitor Mrs. Wagner's vital signs, to control her bleeding, to replenish her lost blood volume, and to maintain her blood pressure," 768 A.2d at 551 n. 5), and did not address her more general allegation that the defendants were "otherwise negligent." *Id.* at 551.

As we have already described, the relevant procedural history is the April 11, 2005 order, by which the court explicitly permitted Miller–McGee to "go forward with the lack of informed consent issue" while specifically recognizing that "Plaintiff's complaint fails to mention a lack of informed consent." In addition, as we explain below, the record shows that defendants/appellees were put on notice of the claim of lack of informed consent during the discovery period. We can discern no reason why it would not have been appropriate for the court to afford Miller–McGee an opportunity to amend her pleadings to conform them to the theory of liability that had emerged during discovery. For all these reasons, we conclude that dismissal of Miller–McGee's suit with prejudice was too severe a result.

■ We have recognized that "Super. Ct. Civ. R. 15 provides that leave to amend a complaint shall be given freely when justice requires," *Epps*, 454 A.2d at 324–25, and that "leave to amend should be given freely 'in the absence of any apparent or declared reason' for not permitting amendment." *Id.* at 325 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Pannell v. District of Columbia*, 829 A.2d 474, 477 (D.C.2003) (referring to the "virtual presumption that leave to amend should be granted unless there are sound reasons for denying it" (internal quotation marks and citation omitted)). Reasons that may justify denying leave to amend are "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies [and] futility of

amendment." *Epps*, 454 A.2d at 325 (citing *Foman*, 371 U.S. at 182, 83 S.Ct. 227).

■ The record in this case presents none of the reasons (and the trial court made no findings as to any reasons) that we have said justify denial of leave to amend. Because Miller–McGee's amended complaint at least arguably encompassed a claim of lack of informed consent, we cannot find that she unduly delayed by never seeking leave to amend her complaint to add a more definite statement of that claim. Similarly, we see no evidence of bad faith or dilatory motive or repeated failure to cure deficiencies. This is not a case in which the plaintiff failed to state a cognizable claim despite successive amendments, *see* note 2 *supra*, such that leave to amend might have encouraged, or appeared to sanction, efforts to delay an inevitable dismissal. There also is no apparent reason why an amendment to add lack of informed consent to the complaint as a new theory of recovery would have occasioned delay or prejudice, because it seems clear that the lack of informed consent claim rests on the same set of facts alleged in the existing amended complaint. The partial deposition transcripts and interrogatory responses that are part of the record on appeal show that, during discovery, counsel explored the facts that bear on the claim of lack of informed consent.[9] As the trial court found, the discovery put appellees on notice of the informed consent issue, and the parties have not asserted that an amendment of the complaint to add a claim of lack of informed consent would

---

9. For example, the following exchange took place between Miller–McGee's counsel and appellee Dr. Muangman during Muangman's deposition:

Q: Okay. And so would I be understanding you correctly to say that you told her about the possibility of a perineal tear?
A: Yes, that's part of my counseling.

. . .

Q: Okay, but what I'm asking you is, did you inform her that she could develop a rectovaginal—she could get a rectovaginal tear from the vaginal delivery, assisted vaginal delivery?
A: I don't recall that.

necessitate further discovery.[10] And, as we discuss further *infra*, an amendment would not have been futile, as it is not "beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C.1999) (citation and quotation omitted).

 Thus, it appears that if Miller–McGee had sought leave of court to amend her complaint to add allegations relating to lack of informed consent even before the court issued its April 11, 2005 order, the court would have abused its discretion in denying her leave to amend.[11] *See, e.g., Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1174 (D.C.1997) (where omission in complaint could be remedied readily without prejudice to defendant and there was no cogent reason to deny a request for leave to amend, court abused its discretion in denying request). Miller–McGee opposed dismissal of her action, relying in part on the court's April 11, 2005 ruling, but she did not request leave to amend her complaint, so the question is whether the trial court abused its discretion in not *sua sponte* affording her an opportunity to amend to avoid dismissal.[12]

---

10. The following observations that we made in *Wagner v. Georgetown Univ. Med. Ctr.* are pertinent here as well:

> Any competent lawyer defending a physician accused of performing surgery in a negligent manner would investigate not only the narrow issue of how the surgery was conducted, but also the facts and circumstances surrounding the surgery, including the events leading up to it. Whether or not an informed consent claim had been asserted, communications between physician and patient prior to the surgery would be a prime subject of inquiry. Defense counsel would need to learn what the physician said in obtaining the patient's consent to the surgery, because counsel would need to know, for example, whether the physician said anything—e.g., about the condition of the patient, the surgery to be performed, or the risks involved—that could be evidence of negligence on the physician's part. Thus, even if the original complaint in this case did not mention lack of informed consent specifically, that complaint was nonetheless calculated to cause counsel for [defendants] to focus on the facts that would underlie such a claim as a routine part of defense preparation.

*Id.*, 768 A.2d at 557–58; *see also Rainer v. Buena Cmty. Mem. Hosp.*, 18 Cal.App.3d 240, 254, 95 Cal.Rptr. 901 (Cal.Ct.App.1971) ("Where additional investigation and discovery is not required to meet the new issue, it would appear that it would constitute an abuse of discretion not to permit the amendment of a complaint [to add a claim of lack of informed consent] even at the outset of a trial, where the amendment merely adds a new theory of recovery on the same set of facts constituting the cause of action.").

11. This case is readily distinguishable from cases that appellees have cited to us, involving trial court decisions denying leave to amend to add claims that had never been foreshadowed before the close of discovery or before entry of the pre-trial order. *See, e.g., Woodland v. District Council 20*, 777 A.2d 795, 799 (D.C.2001) (FMLA claim was never stated with sufficient clarity in any of plaintiff's pleadings in the trial court); *Lowe's Home Ctrs., Inc. v. Olin Corp.*, 313 F.3d 1307, 1314 (11th Cir.2002) (after close of discovery, plaintiff could not add new claims of fraud and negligent misrepresentation to claim of negligent design and supervision); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir.1997) (plaintiff had not raised her claim even in her deposition); *Moore v. West*, 991 F.Supp. 11, 12 n. 1 (D.D.C.1998) (motion to amend was raised for the first time in plaintiff's proposed findings); *Zimmerman v. Robertson*, 259 Mont. 105, 854 P.2d 338, 342 (1993) (plaintiff failed to raise claim both in pleadings and in pre-trial order); *Mahan v. Bethesda Hosp., Inc.*, 84 Ohio App.3d 520, 617 N.E.2d 714, 718–19 (1992) (additional claim was raised for first time on the fourth day of trial and there was nothing in the record as to what the evidence would be).

12. We are *not* foreclosed from considering whether leave to amend should have been granted on the ground that Miller–McGee filed her appeal to this court without

In some circumstances, we have found an abuse of discretion where the trial court dismissed a complaint "without inquiring whether [plaintiff] would seek leave to amend...." *Epps,* 454 A.2d at 325.[13] Nevertheless, the prevalent rule seems to be that "[a]bsent exceptional circumstances, a [trial] court has no obligation to invite a plaintiff to amend his or her complaint when the plaintiff has not sought such amendment." *Karvelas,* 360 F.3d at 242.[14] Ordinarily, the decision whether to grant leave to amend is "squarely within the discretion of the trial court." *Nat'l Ass'n of Postmasters of the United States v. Hyatt Regency Wash.,* 894 A.2d 471, 477 (D.C.2006).

We conclude here, however, that the "procedural history ... lift[ed] this case out of the realm of the ordinary," *Prudhomme v. Tenneco Oil Co.,* 955 F.2d 390, 393 (5th Cir.1992), and created an "exceptional circumstance" that required the court to afford Miller–McGee an opportunity to amend her complaint once the court determined that the complaint was deficient. Because a reasonable interpretation of the April 11, 2005 order was that no

seek[ing] amendment after the dismissal by moving for reconsideration or relief from the judgment. A dismissal with prejudice is a final judgment that slams the door shut on the possibility of future amendments to the complaint unless the judgment is set aside or vacated pursuant to Rule 59 or Rule 60.... Motions for post-judgment relief and direct appeal thus provide two separate avenues through which a plaintiff may challenge the dismissal of a complaint with prejudice and without leave to amend. *U.S. ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 242 n. 30 (1st Cir.2004) (internal quotation marks, citation, and editing omitted).

**13.** *See also Pellerin v.1915 16th St. N.W. Coop. Ass'n,* 900 A.2d 683, 688 (D.C.2006) ("Even though [plaintiff] did not formally move for leave to amend her complaint to assert that new claim, but instead merely included it at the eleventh hour in the Joint Pretrial Statement, precedent in this jurisdiction teaches that the trial court still was obliged to consider whether to allow it." (citing *Lonon v. Bd. of Dirs. of Fairfax Vill. Condo. IV Unit Owners Ass'n,* 535 A.2d 1386, 1388–89 (D.C.1988) ("The decision to exclude a claim because it was not specifically pleaded in the original complaint, however, would require the court to find that the defendants were not on notice of the claim against them, that permitting the claim would cause undue delay, or that some other consideration justified forbidding the plaintiff to amend the complaint at trial."))).

**14.** *See also Wagner v. Daewoo Heavy Indus. Am. Corp.,* 314 F.3d 541, 542, 543–44 (11th Cir.2002) (en banc) (a court "is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend ...") (collecting cases from several federal Circuits supporting this rule); *Flocco v. State Farm Mut. Auto. Ins. Co.,* 752 A.2d 147, 161 (D.C. 2000) (upholding dismissal without leave to amend where a plaintiff "failed to identify in any of his numerous filings a claim ... which he could have filed ... which could have survived," and citing *Confederate Mem'l Assoc. v. Hines,* 301 U.S.App.D.C. 395, 399, 995 F.2d 295, 299 (1993) (holding that where plaintiff made a "bare request ... without any indication of the particular grounds on which amendment is sought," it "could hardly have been an abuse of discretion for the District Court not to have afforded them such leave *sua sponte.*")). *But see Wagner v. First Horizon Pharm. Corp.,* 464 F.3d 1273, 1280 (11th Cir.2006) (court should have ordered repleading sua sponte where problem in the complaint was the need for a more definite statement of the claim rather than failure to state a claim); *Shane v. Fauver,* 213 F.3d 113, 116 (3d Cir.2000) (leave to amend must be given even where a deficiency in a complaint could be cured by amendment but leave to amend is not sought); *Blakely v. Wells,* 209 Fed.Appx. 18, 21, 2006 WL 3770840, **2, 2006 U.S.App. Lexis 31031, *6 (2d Cir. Dec. 13, 2006) ("Because the District Court did not find Plaintiffs' claims to be entirely frivolous on their face, we conclude that the District Court exceeded its allowable discretion in dismissing the action without affording Plaintiffs an opportunity to amend.").

further amendment to the complaint was needed to keep the lack of informed consent claim alive, Miller–McGee's failure to request leave to amend can fairly be regarded as "court induced prejudicial inaction," *Prudhomme*, 955 F.2d at 394, that cabined the court's discretion. In this circumstance, the court's departure from its initial ruling about whether the claim could go forward—without at least affording Miller–McGee a reasonable time within which to amend her complaint—was "fundamentally unfair and unreasonable" and "the very stuff of which abuse of discretion is made." *Id.* at 395.[15]

## II.

Appellees urge us, in the event that we conclude that Miller–McGee's failure to amend her complaint did not warrant dismissal, to reach the issue that the trial court did not reach, *i.e.*, the issue of whether, on the undisputed *facts of record*, summary judgment was warranted because the lack of informed consent claim would fail as a matter of law. We go on to consider that issue because, as our discussion above indicates, it is pertinent to whether it would have been futile to afford Miller–McGee an opportunity to amend her complaint. We begin by summarizing what a plaintiff must prove to establish liability for failure to obtain informed consent.

Our case law on lack of informed consent recognizes the "duty of a physician to inform the patient of the consequences of a proposed treatment," a duty that "stems from the right of every competent adult human being to determine what shall be done with his own body." *Crain*, 443 A.2d at 561; *see also Canterbury v. Spence*, 150 U.S.App. D.C. 263, 271, 464 F.2d 772, 780 (1972).[16] "In order to prevail in an action based on a theory of informed consent, the plaintiff must prove that if he had been informed of the material risk, he would not have consented to the procedure and that he had been injured as a result of submitting to the procedure." *Cleary*, 691 A.2d at 155 (internal quota-

---

**15.** In *Prudhomme*, the trial court had ordered dismissal of a proposed amended complaint that would have added a strict liability claim. Thereafter, on the eve of trial, the court announced that it would permit plaintiff to try the strict liability claim, to the prejudice of defendants, which had forgone any preparation to defend against that claim and were "lulled into preparing to defend against ... alleged negligence only." 955 F.2d at 395. The Fifth Circuit held that these facts required reversal of the verdict against defendants, notwithstanding the trial court's "broad discretion in the management of its docket and the trial of lawsuits pending before it," *id.* at 392, because the "court misled [defendant] and induced prejudicial inaction." *Id.* at 395; *see also Lockhart v. Cade*, 728 A.2d 65, 69 (D.C.1999) ("when a judge unexpectedly departs from the terms of a prior order, any party prejudiced by that departure ... should be entitled to redress"); *cf. Boling v. United States*, 39 Fed.Cl. 252, 253 (Fed.Cl.1997) ("fundamental fairness dic-

tate[d]" that plaintiffs, who were "misled" by court's earlier statements, have restored to them an opportunity to pursue their challenge after court reached a different ultimate determination); *Daramy v. United States*, 750 A.2d 552, 557 (D.C.2000) (permitting defendant to withdraw her guilty plea, and reversing her conviction, upon her argument that she had been "lulled into a false sense of security" by misleading statements of the trial court); *Robinson v. Evans*, 554 A.2d 332, 335 (D.C. 1989) (applying the "lulling doctrine" and holding that "[w]hen the appellant has been affirmatively misled into delaying the filing of a notice of appeal by some action or conduct of the trial court, the appeal will be allowed if the notice of appeal is timely filed after the misleading action has been corrected."); *Frain v. District of Columbia*, 572 A.2d 447, 450 (D.C.1990) (same).

**16.** We "expressly adopted *Canterbury* in *Crain*. ..." *Tavakoli–Nouri v. Gunther*, 745 A.2d 939, 942 n. 1 (D.C.2000).

tions and citation omitted); *see also Anderson v. Jones,* 606 A.2d 185, 188 (D.C. 1992). Adhering to the rationale of *Canterbury,* we have said that:

> The test for mandatory disclosure of information on treatment of the patient's condition is whether a reasonable person in what the physician knows or should know to be the patient's position would consider the information material to his decision. The information is material if the reasonable person in what the physician knows or should know to be the patient's position would be likely to attach significance to the risks in deciding to accept or forego the proposed treatment.... [A]t a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment.

*Crain,* 443 A.2d at 562. "[N]ot all risks need be disclosed; only material risks must be disclosed." *Id.*[17] Thus, to recover on a claim of lack of informed consent, a plaintiff must prove that there was an undisclosed risk that was material; that the risk materialized, injuring plaintiff; and that plaintiff would not have consented to the procedure if she had been informed of the risk. A material risk is a risk "which a reasonable person would consider significant in deciding whether to undergo a particular medical treatment." *Abbey v. Jackson,* 483 A.2d 330, 332 (D.C.1984).

▮▮▮▮ There must be expert testimony to establish some of the elements of proof. *See Cleary,* 691 A.2d at 153–54. In general, expert testimony is " 'required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient.' " *Id.* (quoting *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014, 1024 (1977)). But a plaintiff " 'can establish a prima facie case of lack of informed consent through the expert testimony of defendant physicians and defense witnesses without calling independent experts.' " *Tavakoli–Nouri,* 745 A.2d at 942 n. 2 (D.C.2000) (quoting *Abbey,* 483 A.2d at 333). Issues "not requiring expert testimony typically ask a jury to determine whether an unrevealed risk materialized, whether the physician told the patient about that risk, and whether the physician should have known that knowledge of that risk might affect the patient's decision." *Cleary,* 691 A.2d at 155.

Here, the trial court had before it evidence (discussed on the transcript pages of Dr. Muangman's deposition that were attached to appellant's opposition to appellees' motion for dismissal) that "during the process of delivery, there was a tear of the mother's perineum that extended through the rectal sphincter and rectal mucosa" (*i.e.,* "the lining of the rectum" and "the muscle that's involved in controlling [fecal] continence"), and that appellant had a "fourth degree perennial [sic] laceration delivery," a degree of laceration that involves the rectal sphincter and rectal mucosa. In their briefs submitted to this court, appellees do not dispute that appel-

---

**17.** "A physician is relieved of his duty to inform his patient (1) in an emergency situation when the patient is incapable of consent, no relative or guardian can be obtained to give the necessary consent to the treatment, and imminent harm from non-treatment outweighs any harm threatened by the proposed treatment; and (2) when the physician reasonably believes that the patient's reaction to the risk information will pose a threat to the patient's well being." *Crain,* 443 A.2d at 562–63.

lant sustained an injury caused by the delivery of her child,[18] but assert that their own experts "will not testify that vaginal laceration was a material risk in this case." Appellees also contend that Miller–McGee cannot prove, without an expert of her own, that a rectovaginal tear is a material risk from an assisted vaginal delivery. However, on the issue of whether an extensive laceration was a risk of an assisted vaginal delivery, it appears that appellant will be able to rely on the testimony of appellees or their experts. For example, during his deposition, appellee Dr. Muangman testified that an assisted vaginal delivery "does lead to an increased risk of tears" and that "the tear is definitely a risk factor for developing into a rectovaginal fistula." Indeed, he maintains that he told Miller–McGee about the "possibility of a perineal tear." [19] We note, in addition, that appellant's brief opposing summary judgment asserted that one of appellees' experts, Dr. Lee Smith, Director of the Section of Colon and Rectal Surgery at Washington Hospital Center, testified that "25% of the patients that he sees with tears involved 4th degree tears," and that the most common reason is childbirth.

■■■■■■ On the issue of whether the risk of an extensive vaginal tear was mate-rial, appellees rely on the affidavit of their expert, Dr. Donald Chambers, who states that in his opinion "the risk of laceration during delivery *was not a material risk* in Plaintiff's case because a caesarian section was not medically indicated" (italics added). However, the rule in this jurisdiction is that once there has been expert testimony regarding the likelihood of the injury, materiality—*i.e.*, whether a risk is a *material* risk—is an issue for the fact-finder. *See Canterbury*, 150 U.S.App. D.C. at 279, 464 F.2d at 788 ("Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts."), and 150 U.S.App. D.C. at 283, 464 F.2d at 792 ("Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision."); *see also Kissinger v. Lofgren*, 836 F.2d 678, 681 (1st Cir.1988) (remote or unforeseeable risks are immaterial as a matter of law, but once there is testimony that the injury is a known risk, it is " 'the jury's responsibility to decide whether that peril was of sufficient magnitude to bring the disclosure duty into play' ") (quoting *Canterbury*, 150 U.S.App. D.C. at 285, 464 F.2d at 794).[20] Thus, it is

---

**18.** The apparent absence of dispute as to causation distinguishes the instant case from *Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C.1984), in which we upheld a directed verdict for the defendant where the plaintiff had no expert testimony that the condition of his shoulder had deteriorated as a result of surgery on the shoulder.

**19.** By contrast, as noted *supra*, Miller–McGee states in her affidavit that "[a]t no time did anyone discuss a vaginally assisted birth with me, and at no time did anyone discuss with me the possibility of a recto-vaginal tear that could result from a vaginally assisted birth," and that she "did not have any discussion with Dr. Muangman regarding risks, benefits and alternatives of a vaginal delivery."

Whether Dr. Muangman disclosed the risks attendant to an assisted vaginal delivery and did so adequately is a jury question. *See Crain*, 443 A.2d at 564 ("[T]he jury could fairly conclude from the evidence that warnings were not given or, if given, were unreasonably inadequate under the circumstances."); *see also Tavakoli–Nouri*, 745 A.2d at 942 ("[Q]uestions of credibility involving whether an individual had been informed of risks and alternatives to a medical procedure are traditionally within the province of the jury.") (citing *Eibl v. Kogan*, 494 A.2d 640, 642 n. 2 (D.C.1985)).

**20.** *See generally* Barbara L. Atwell, *The Modern Age of Informed Consent*, 40 U. RICH. L.REV. 591, 596–97 (2006) (noting that the

not Dr. Chambers' or any other expert's role—but instead the role of the jury—to say whether the known risks of vaginal laceration and of a rectovaginal fistula were sufficiently material that there was a duty to disclose them to appellant.[21]

Finally, appellees argue that Miller–McGee cannot prove that she would have withheld consent to an assisted vaginal delivery if she had been informed of the risk of sustaining an extensive vaginal laceration.[22] They imply that appellant would have had no choice but to consent, because appellees' own experts would "not testify that a caesarian was a viable alternative."[23] In the trial court, appellees relied on the affidavit of Dr. Chambers, who stated that "a caesarian section was not medically indicated in Plaintiff's case"; that a c-section "is not offered to a patient as an alternative to vaginal delivery or assisted vaginal delivery unless for some reason surgery is medically necessary"; and that "[o]nly when a caesarian is medically indicated, is it considered to be an alternative." However, the record before

us also includes Dr. Muangman's deposition testimony that "[i]t was my opinion that, given the station of the baby's head and *the different delivery options, that the option that would have gotten the baby delivered the most expeditiously was the assisted vaginal delivery,* which the patient did agree to" (italics added). Thus, on this factual record, we cannot say that appellant could not prove that had she known of the risk of a rectovaginal fistula, she could have and would have opted for some method of delivery other than a forceps-assisted vaginal delivery.

■ Furthermore, appellees' argument that a c-section was not an alternative for appellant because "a c-section *is not offered* to a patient as an alternative to vaginal delivery or assisted vaginal delivery unless for some reason surgery is medically necessary" (italics added) suggests that professional custom or practice alone may dictate whether the obstetrical patient has an alternative. That suggestion is incorrect as a matter of law.[24] As

case law establishes that "whether or not adequate information has been given to the patient must be determined from the viewpoint of the reasonable patient-not the viewpoint of the medical professional.").

21. In *Canterbury*, the court found that when it was established "that paralysis can be expected in one percent of laminectomies," the evidence that the doctor "did not reveal the risk of paralysis from the laminectomy made out a prima facie case of violation of the physician's duty to disclose," and it became "the jury's responsibility to decide whether that peril of sufficient magnitude to bring the disclosure duty into play." 150 U.S.App.D.C. at 270, 285, 464 F.2d at 779, 794; *see also id.* at 150 U.S.App.D.C. at 279 n. 86, 464 F.2d at 788 n. 86, and accompanying text (noting that a "very small chance of death or serious disablement may well be significant," and collecting cases referencing percentage chances of injury and determining whether disclosure of the risk was required).

22. The actual test is "what would a prudent person in the patient's position have decided if informed of all relevant factors." *Crain*, 443 A.2d at 563 n. 14. "Although the patient's testimony is relevant on the issue of causation, the test of causation is objective." *Id.*

23. *See Canterbury*, 150 U.S.App. D.C. at 281, 464 F.2d at 790 ("The patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils.").

24. Appellees' argument below—that "[t]he alternative to a vaginal delivery is a cesarian section delivery which is premised solely on medical parameters and cannot be offered to a patient for lay purposes" and that "[a] patient cannot opt, simply because she desires a cesarian section delivery over a vaginal delivery, for no medically substantiated basis"—is similarly defective.

We note, tangentially, that a November 2004 Kaiser Family Foundation report avail-

the District of Columbia Circuit admonished in *Canterbury*, the patient's cause of action for lack of informed consent is not "dependent upon the existence and non-performance of a relevant professional tradition." *Canterbury*, 150 U.S.App. D.C. at 274, 464 F.2d at 783. That is because "to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone." *Id.* at 275, 464 F.2d at 784. "Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." *Id.*

We note that courts in some other jurisdictions have specifically held that the duty of informed consent requires a physician to inform an obstetrical patient about a cesarean section as an option even if the physician does not believe that it is medically necessary, and even if the physician himself or herself would not offer to perform the cesarean section. *See Harrison v. United States*, 284 F.3d 293, 301–02 (1st Cir.2002) (reasoning that "it is the patient's prerogative to balance [the] risks and choose the form of treatment that best meets the patient's needs," reversing the trial court's judgment that the doctor was under no duty to afford the patient the opportunity to have a cesarean section, and holding that "because there are only two methods of childbirth, if the district court finds the risk of vaginal birth to be material to the patient, then [the doctor] had a duty to present the alternative option of a C-section that might minimize such risk, regardless of his medical opinion on the proper course of treatment.");[25] *Harrison v. United States*, 233 F.Supp.2d 128, 134 (D.Mass.2002) (noting that the "very purpose of informed consent [is] empowerment of the patient," and holding that "because there are only two methods of childbirth, once there is a material risk to vaginal birth, the doctor's duty to disclose that risk also encompasses the duty to present information about C-sections"); *Schreiber v. Physicians Ins. Co. of Wis.*, 223 Wis.2d 417, 588 N.W.2d 26 (1999) (holding that where patient in labor informed doctor that she wanted to abandon the plan to which she had previously consented to have a vaginal birth, and to have a cesarean section instead, and doctor "knew that the cesarian delivery was a viable medical option but did not consider it to be medically indicated," doctor nonetheless had an obligation to conduct a new informed consent discussion and afford the patient the opportunity for a choice of treatment, and rejecting "the notion that the onset of a procedure categorically forecloses a patient's withdrawal of con-

able at http://www.kaisernetwork.org/daily—reports/rep—index.cfm?hint=2 & DR—ID=26854, states that "The rate of caesarean-section delivery among U.S. women with uncomplicated pregnancies and no medical reason for a surgical delivery increased 67% between 1991 and 2001." The report refers to statements by researchers "that more study is needed to determine [ ] whether the risk of an elective c-section could be offset by the potential benefits of avoiding a vaginal delivery."

**25.** In its *Harrison* decision, the United States Court of Appeals for the First Circuit emphasized, "so as not to unduly burden the practice of medicine," that the physician's duty to disclose does not necessarily mean that the doctor must offer to perform a cesarean section if the doctor does not consider one to be warranted in his medical judgment. 284 F.3d at 302 n. 8. The *Harrison* trial court further explained that a doctor cannot escape liability for breach of informed consent merely by arguing that he himself would have been unwilling to perform the alternate procedure about which he failed to inform the patient. *See* 233 F.Supp.2d at 134 ("Once a doctor has informed a patient about alternatives, the patient can then make her own assessment and seek out medical care that is in accordance with her decision.").

sent"); [26] *Bankert v. United States,* 937 F.Supp. 1169, 1184 (D.Md.1996) (holding, in a case in which the physician refused the patient's request for a cesarean delivery and decided to proceed with a trial of labor, that although the doctor "exercised his medical judgment and determined that cesarean delivery was not medically indicated, he nevertheless denied [plaintiff] the right to withdraw her consent to a particular medical procedure, and he denied her the opportunity to exercise her personal autonomy to make decisions regarding her own body" and thereby violated her right to informed consent); *see also Villanueva v. Harrington,* 80 Wash.App. 36, 906 P.2d 374, 377 n. 9 (1995) (remanding for trial suit in which patient alleged that physician had not obtained her informed consent for a forceps-assisted delivery, and noting testimony describing alternatives to forceps-assisted delivery); *Gordon v. Bakare,* 38 Pa. D. & C.4th 388, 392 (Pa. Common Pleas 1998) (allowing plaintiff to go forward with suit claiming that her doctor did not discuss with her the surgical alternative to a forceps-assisted delivery); *Canterbury,* 150 U.S.App. D.C. at 272, 464 F.2d at 781 ("[I]t is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie.").

█ We cannot tell from the record here whether a cesarean section would have been one of the options for Miller–McGee given the specific complications that developed with her delivery and the time pressures that surrounded it.[27] Among other things, it is not clear to us whether Dr. Muangman's testimony that a cesarean section was "not medically indicated" means that a cesarean section would not have been feasible or viable for whatever reason, or that Dr. Muangman would not have been willing to perform one, or that a cesarean section was not necessary, or something else.[28] We conclude only that, on the record as it stands before us, it is not a foregone conclusion that Miller–McGee would not have been able to prove, without an expert of her own, that there was an alternative to a forceps-assisted vaginal delivery, and that a reasonable person in her place would have chosen that alternative if informed of the risks that an assisted delivery presents.

Accordingly, for the foregoing reasons, we reverse the dismissal of the lack of informed consent cause of action and remand the case for further proceedings consistent with this opinion.

*So ordered.*

26. *See* Suzanne K. Ketler, *The Rebirth of Informed Consent: A Cultural Analysis of the Informed Consent Doctrine After Schreiber v. Physicians Ins. Co. of Wisconsin,* 95 N.W. L.Rev. 1029 (2001) (discussing the "contemporary cultural model ... based on the notion that the course of labor and birth is not 'natural' but is in fact the outcome of choices based on rational decision-making guided by the laboring patient," and noting that the decision in *Schreiber,* which suggests that "informed consent is a process rather than an endpoint," has "the potential to revitalize the informed consent doctrine and bring it closer to the principles on which it was founded").

27. We note, for example, that Dr. Muangman testified that he made a determination to expedite delivery to avoid injury to the child, and that he had a conversation with Miller–McGee about this "while she [was] pushing."

28. Accordingly, at least at this juncture, we are not called to decide whether an obstetrical patient has a right to elect a c-section delivery if a c-section is a viable option. Thus, we escape a variant of the weighty issue that we faced in *In re A.C.:* the question of "who should decide how [a] child should be delivered." *In re A.C.,* 573 A.2d 1235, 1245 n. 9 (D.C.1990) (en banc).

FISHER, Associate Judge, dissenting:

For me, the crucial procedural fact is that appellant never sought leave to amend her complaint. "A [trial] court is not required to grant a plaintiff leave to amend [her] complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the [trial] court." *Wagner v. Daewoo Heavy Industries America Corp.*, 314 F.3d 541, 542 (11th Cir.2002) (en banc).

Stepping back for a moment, it is clear to me that the present (amended) complaint *does not* allege that the doctor proceeded without the patient's informed consent. Those words do not appear in the complaint, nor is that claim fairly inferred from the words that do appear. *See Cleary v. Group Health Ass'n, Inc.*, 691 A.2d 148, 155 (D.C.1997) ("informed consent claims concern a duty of the physician which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills" (internal quotation marks and citation omitted)); see also note 3, *supra* (quoting from amended complaint). We may have "liberal" rules of pleading, *see generally In re Estate of Curseen,* 890 A.2d 191 (D.C. 2006), but Civil Rule 8 still requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Super. Ct. Civ. R. 8(a)(2). The complaint in this case fails even that very lenient test.

It is not enough that appellant articulated that theory in discovery. She still is required to plead it, and deposition testimony and answers to interrogatories are not pleadings. *See* Super. Ct. Civ. R. 7(a). This is not a technicality, but rather a fundamental principle of our rules for conducting civil litigation.

The majority acknowledges what it calls "the prevalent rule," that "[a]bsent exceptional circumstances, a [trial] court has no obligation to invite a plaintiff to amend his or her complaint when the plaintiff has not sought such amendment." *Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 242 (1st Cir.2004). We part company when the majority concludes that "exceptional circumstance[s]" are present here— that the trial court, in effect, "lulled" appellant into complacency. With respect, that conclusion is not fair to the trial court.

It is true that the court's order of April 11, 2005, stated that the plaintiff could "go forward on the lack of informed consent issue.…" This ruling was based on the court's conclusion that defendants "had notice of this theory" from discovery. If the trial court thereafter had changed its mind *sua sponte* and dismissed for failure to state a claim, that would have been unfair. But on April 28, 2005, appellees filed a renewed motion to dismiss and/or for summary judgment arguing, among other things, that plaintiff was required *to plead* her claims and that her "failure to amend her complaint to allege Lack of Informed Consent is fatal." Appellant responded on June 27, arguing first that appellees had been put on notice of that claim through discovery and also that "[i]n her complaint, the plaintiff clearly alleges medical negligence, and lack of informed [sic] is clearly a form of medical negligence." Appellant had a full opportunity to brief the issue (and to make any related motions) before the court ruled (correctly, in my view) "that the Complaint did not state a claim for lack of informed consent."

Appellant may have been startled by that ruling, but she cannot claim unfair surprise. She knew her complaint had been attacked for failure to state a claim, and she was not entitled to assume that the trial court would deny the motion. Even if he chose to defend the complaint as drafted, a prudent attorney would have,

in the alternative, sought leave to amend if the court ruled otherwise. If he had not taken this precaution, the attorney could have filed a timely motion under Civil Rule 59 or 60, seeking leave to amend. At no time did appellant ask the trial court for leave to amend her complaint, and the trial court was not obliged to invite her to do so. *Karvelas,* 360 F.3d at 242. *See also James Cape & Sons Co. v. PCC Construction Co.,* 453 F.3d 396, 400–01 (7th Cir. 2006) (rejecting argument that "even though [plaintiff] did not properly request leave to amend its complaint, the district court was *required* by Rule 15 to dismiss without prejudice and/or *sua sponte* grant leave to amend the complaint").

Under the circumstances, it is likely that the plain error standard governs our review instead of the already deferential abuse of discretion standard. I need not resolve that question, however, because the Superior Court neither abused its discretion nor committed plain error by failing to grant relief that was never requested. *See Greenidge v. Allstate Insurance Co.,* 446 F.3d 356, 361 (2d Cir.2006) ("a district court does not abuse its discretion when it fails to grant leave to amend a complaint without being asked to do so"); *Karvelas,* 360 F.3d at 242 n. 32 (deciding appeal without resolving whether court should review for plain error or abuse of discretion); *Emerito Estrada Rivera–Isuzu de P.R., Inc. v. Consumers Union of United States, Inc.,* 233 F.3d 24, 30 (1st Cir.2000) (pointing out that plaintiff did not amend complaint as of right—as it could have—or "formally ask the district court after judgment to permit such an amendment," citing Rules 59 and 60; "we cannot say that the district court committed error, let alone plain error, by failing to *invite* Emerito to replead.").

I also am skeptical that appellant can prove her belated claim of lack of informed consent without testimony from an expert witness of her own. I would not reach this complicated issue, however, because I would uphold the trial court's dismissal of the complaint.

I respectfully dissent.