**Robert BUNN, Appellant/Cross–Appellee,**

v.

**URBAN SHELTERS AND HEALTH CARE SYSTEMS, INC., Appellee/Cross–Appellant.**

**Nos. 94–CV–903, 94–CV–959.**

District of Columbia Court of Appeals.

Argued Jan. 4, 1996.

Decided Feb. 29, 1996.

fense. The process results in an initial score ranging from zero to ten. 28 DCMR § 204.4–17.

James M. Fallon, Jr., Washington, DC, for appellant/cross-appellee.

Stephen P. Zachary, Washington, DC, for appellee/cross-appellant.

Before FARRELL and REID, Associate Judges, and PRYOR, Senior Judge.

REID, Associate Judge:

Robert Bunn, Esquire, was appointed guardian of Edith Jenkins and conservator of her estate in March 1992. In November 1992, the Probate Division of the Superior Court (trial court) authorized him to bring a civil action in behalf of Ms. Jenkins to seek damages for a fractured hip sustained while she was in the care of the J.B. Johnson Nursing Home (J.B.), operated by Urban Shelters and Health Care Systems (USHCS). Bunn filed a complaint alleging negligence and demanded one million dollars in damages and costs. At the end of the plaintiff's case, the trial court directed a verdict in behalf of USHCS, concluding that the evidence failed as a matter of law to support plaintiff's theory of liability: *res ipsa loquitur.* Bunn filed a timely appeal. USHCS filed a cross appeal to strike the testimony of Bunn's medical expert, in the event that Bunn's appeal is successful. We affirm the trial court's ruling.

## FACTUAL SUMMARY

On November 25, 1991, Edith Jenkins was found to have a fractured hip. She had been under the care of the J.B. Johnson Nursing Home since 1981. J.B. was owned by the

District of Columbia government and managed by USHCS. At the time of her injury, Ms. Jenkins was sixty-five years of age, weighed seventy-four pounds, and was a total care patient who could not communicate orally. She had not walked since 1979 and alternated between confinement in bed and in a "geri chair." Her bones were of poor quality and she was described as "osteopenic." She also suffered from dementia and seizures.

Ms. Jenkins was transported to Howard Univ. Hosp. where she was diagnosed as having a spiral fracture of the right hip. Dr. Richard Grant, Chief of Orthopedic Surgery at Howard University, recommended surgery. After the appointment of Bunn as guardian and conservator, surgery was performed and Ms. Jenkins remained at the hospital until March 1992. Her hospital and surgical bills amounted to more than $117,-000. On November 19, 1992, Bunn filed a complaint alleging negligence against USHCS. The case was tried to a jury strictly on the theory of *res ipsa loquitur.*

At trial, the nursing assistant who attended Ms. Jenkins on the late afternoon and evening of November 25, 1991, Ms. Muska Deen, testified regarding her actions and observations when she transferred Ms. Jenkins to a shower chair, took her for a shower around 6 p.m., returned her to her room and lifted her onto her bed. The nursing assistant acted alone and had no help in lifting Ms. Jenkins into the shower chair, or onto the bed. Ms. Deen first observed Ms. Jenkins' distress when she picked her up from the nursing station. She was crying more than she usually cried. Ms. Deen gave Ms. Jenkins a quick shower and took her to her room. She moved the shower chair close to the bed and placed her on the bed. When Ms. Jenkins continued to evidence signs of discomfort, the nursing assistant testified that she called the "charge nurse," Ms. Lawrence, who is now deceased. Ms. Lawrence in turn called the nursing supervisor at J.B., Ms. Marie Perrin, a registered nurse, who saw Ms. Jenkins at approximately 8:15 p.m. She found Ms. Jenkins to be "noisy and agitated," and her right hip was "cold and tender to touch." Nursing notes admitted into evidence revealed that the deceased

nurse had made an entry around 10 p.m. on November 25, 1991, indicating that Ms. Jenkins was "agitated" and "crying." She was in obvious pain and her hip felt like "crushed ice." The notes also mentioned Ms. Jenkins' transfer to Howard University Hospital around 11:30 p.m.

Dr. Richard Grant testified at trial and was asked whether he had formed "an opinion as to what the mechanism or cause of the injury was"? He replied:

> Yes, I do have an opinion.... Well, in looking at the radiographs and the, looking at the appearance of the fracture during the time that we did the surgery, I felt that this is a combination of some type of impact and twisting.... With the impact you get a straight fracture from greater trochanter to greater trochanter. But with this fracture pattern there was more of extension down the proximal shaft and it twisted around or it was what we call a spiral type ... of pattern.

In short, Dr. Grant thought that Ms. Jenkins had suffered "some type of fall or impact ... and a twist." He was asked whether it is possible that the fracture arose out of Ms. Jenkins' "normal activities." Dr. Grant responded:

> Well, it is possible. The question that I would raise in my mind is if it is possible, is it probable? It didn't to me appear to be that probable. I was trying to imagine a 74-pound woman generating enough force to break her bone and then also break the femur between the greater trochanters. And I can't, it doesn't seem to me probable, I'll put it that way.

Counsel for Bunn also inquired whether "to the extent that [Ms. Jenkins] didn't have some kind of fall or some kind of a traumatic thing that in her situation she would be more vulnerable to a broken hip than maybe you or I would be"? Dr. Grant responded:

> Oh, I think certainly Ms. Jenkins is very vulnerable to fracture. She's been bedridden. She certainly has radiographic appearance of osteopenic bone. The nurse's notes indicate that she has poor dietary intake. She is at a higher risk than certainly anybody in this room. And, but those are risks that you would have to

accept in the geriatric population and take precautions for.

On cross-examination, Dr. Grant admitted that one would expect to find "severe osteoporosis in a woman who hasn't walked for 12 years." Further, he confirmed that Ms. Jenkins took a drug called dilantin for her seizures, and that this drug "can affect the bone indirectly by affecting the biochemical pathway in the liver." He confirmed that Ms. Jenkins had a history of thyroid disease, which could affect the bones, and that Ms. Jenkins' bones appeared older than her chronological age. He did not think it probable that the fracture resulted from Ms. Jenkins' "being picked up." Within three weeks of Ms. Jenkins' surgery after her hip fracture, one of the screws in the metal plate placed against her bones tore away. Dr. Grant initially thought that an infection was the cause of the tearing away, but subsequently found no infection. He concluded that "it was probably due to the poor quality of the bone."

Ms. Alberta Brasfield, who was the nursing home administrator in November 1991, testified that J.B.'s mission is "to provide nursing care for the fragile and elderly." She described Ms. Jenkins as a "total care patient," which meant that: "The staff does everything for her, give her baths. They have to feed her; they have to dress her, transfer her." Ms. Brasfield asked the then director of nursing, Ms. Hayden, to conduct an investigation of Ms. Jenkins' injury.

Ms. Joyce Hayden testified regarding her investigation of the events concerning Ms. Jenkins, and the policies of J.B. regarding the transfer of a patient into a bed from a chair. One of the "points of emphasis" with respect to the policy stated: "Always get assistance when lifting a patient." Two others stated: "Lift patient gently" and "Lower patient gently, don't drop on bed or chair." Ms. Hayden confirmed that Ms. Deen lifted Ms. Jenkins without assistance. She also indicated that Ms. Jenkins' muscles or bones had atrophied and her legs were in "a fixed position ... at about a 20- or 30-degree angle" with her knees up—"very much like a person kind of sitting in a chair."

At the conclusion of Bunn's case, USHCS moved for a directed verdict, on two grounds. First, he argued that Dr. Grant had not given "an opinion within a reasonable degree of medical certainty." The trial judge pointed out that USHCS had not objected at the time of Dr. Grant's testimony. Second, he contended that Bunn did not prove how Ms. Jenkins fractured her hip, and "whether or not there was any negligence on the part of the defendant in this case." During discussion with counsel for USHCS, the trial judge stated:

> I think from Dr. Grant's testimony it's fair to infer that, that there was some unspecified impact that gave rise to, and twist that gave rise to the injury. That it wasn't an injury that could have been suffered simply by her lying in bed. And I think the, the tricky question is whether or not there is any evidence, even if one does take Dr. Grant's testimony and give it full value, ... that the injury was caused by some form of impact. The question is whether there is any evidence that would allow a reasonable jury to conclude that it is more probable than not that impact resulted from carelessness of anyone at the Johnson Nursing Home.

The trial judge granted USHCS's motion for a directed verdict.

## ANALYSIS

■ Under Super.Ct.Civ.R. 50(a)(1), a directed verdict is appropriate after "a party has been fully heard with respect to an issue" provided "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Bunn alleged negligence against USHCS. To sustain his initial burden of proof, Bunn was required to establish a *prima facie* case of negligence. As we said in *Bell v. Jones,* 523 A.2d 982, 987 (D.C.1986): In a professional negligence action, the plaintiff "bears the burden of presenting evidence 'which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of.'" (quoting *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.1979), quoting

from *Kosberg v. Washington Hosp. Ctr., Inc.*, 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968)). Due to the lack of any direct evidence of negligence on the part of USHCS, Bunn sought to rely on the doctrine of *res ipsa loquitur* to establish his *prima facie* case.

■ *Res ipsa loquitur* has been described as a "procedural rule of evidence," *Andrews v. Forness*, 272 A.2d 672, 673 (D.C. 1971) (quoting *Powers v. Coates*, 203 A.2d 425 (D.C.1964)), and a "rule of justice," *St. John's Hosp. & Sch. of Nursing v. Chapman*, 434 P.2d 160, 167 (Okla.1967). The doctrine is used "to establish the defendant's duty of care and the breach of that duty." *Virginia S. v. Salt Lake Care Ctr.*, 741 P.2d 969, 971 (Utah App.1987); *see also Quin v. George Washington Univ.*, 407 A.2d 580, 582 (D.C. 1979).[1] It "permits an inference that a known accident was caused in a negligent manner." *Quin, supra*, at 585. The accident or happening itself "affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care." *Id.* at 582 (quoting *Kerlin v. Washington Gas Light Co.*, 110 F.Supp. 487, 489 (D.D.C.1953)). Before *res ipsa loquitur* can be held to apply to a happening or accident, however, a plaintiff must demonstrate that: (1) an event would not ordinarily occur in the absence of negligence; (2) the event was caused by an instrumentality in

defendant's exclusive control; and (3) there was no voluntary action or contribution on plaintiff's part. *District of Columbia v. Billingsley*, 667 A.2d 837, 841 (D.C.1995) (quoting *Marshall v. Townsend*, 464 A.2d 144, 145 (D.C.1983)); *see also Quin*, 407 A.2d at 583.

■ We are aware of no case decided by this court which applies the doctrine of *res ipsa loquitur* to an accident occurring in a nursing home, or a skilled nursing facility. Though such a case might arise,[2] on the facts and record in this case, we sustain the grant of a directed verdict. Bunn has not met the first prong of the *res ipsa loquitur* test: (1) an event would not ordinarily occur in the absence of negligence or when due care is exercised. *See Billingsley, supra*, at 841 and *Quin, supra*, at 583. We have previously emphasized the fact that: "the mere happening of an accident does not give rise to any inference of negligence." *Krebs, supra*, at 559. Moreover, we cannot imply negligence in this case "based solely on the fact that an adverse result" occurred during a total care patient's residence in a nursing facility. *See Quin, supra*, at 583.

Dr. Grant testified that, in his opinion, the spiral fracture resulted from an impact and a twisting. He also opined that while the injury might possibly have resulted from Ms. Jenkins' "normal activities" at the nursing home, it was not possible that "a 74–pound woman [could] [generate] enough force to

---

**1.** One of the earliest statements of the doctrine was enunciated in an old English case, *Scott v. London & St. Katherine Docks Co.*, 3 H. & C. 596, 159 Eng.Rep. 665 (1865):

> There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.

*See also* PROSSER AND KEETON ON TORTS, at 244 (5th ed. 1984).

**2.** The doctrine has been applied to nursing homes in other jurisdictions. *See* for example *Virginia S. v. Salt Lake Care Ctr.*, 741 P.2d 969 (Utah App.1987). We have applied the doctrine in cases involving elevators and escalators. *See Hailey v. Otis Elevator Co.*, 636 A.2d 426 (D.C. 1994); *Otis Elevator Co. v. Tuerr*, 616 A.2d 1254

(D.C.1992); *Bell v. Westinghouse Elec. Corp.*, 483 A.2d 324 (D.C.1984); and *Washington Sheraton Corp. v. Keeter*, 239 A.2d 620 (D.C.1968). We have also applied the doctrine in cases where a tangible mechanism is connected to an injury, such as a heating and water system, *Powers, supra;* or a loose manhole cover, *Uberti v. District of Columbia*, 215 A.2d 766 (D.C.1966). We applied the doctrine in a case where appellee parked his motor vehicle, without permission, just inside a garage in which appellant maintained his art studio and plexiglass sculptures. The bumper of his car was in close proximity to a large sculpture. Somehow, appellee's body, the known cause of the accident, was propelled into the air while he was working on the car, and landed on a plexiglass sculpture, resulting in the destruction of four sculptures. *See Krebs v. Corrigan*, 321 A.2d 558 (D.C.1974). We have given the doctrine "very limited application in malpractice actions." *See Lathon v. Hadley Memorial Hosp.*, 250 A.2d 548 (D.C.1969); *Quin v. George Washington Univ., supra.*

break her bone and then also break the femur between the greater trochanters." Nonetheless, he also stated that Ms. Jenkins was "very vulnerable to fracture" because of osteopenic bone, and admitted that one would expect to find "severe osteoporosis in a woman who hasn't walked for 12 years." He did not believe that the lifting of Ms. Jenkins caused the fracture. He confirmed that Ms. Jenkins had a history of thyroid disease which could affect the bones, and that the drug she took for her seizures, "dilantin," can affect the bone indirectly. Moreover, he acknowledged that one of the screws in the metal plate placed against her bones during surgery tore away after surgery. He attributed this to the poor quality of Ms. Jenkins' bones.

Bunn presented no testimony that the impact and twisting, which Dr. Grant identified as the cause of the spiral fracture, resulted from a lack of due care. While Dr. Grant's testimony suggested that the standard of care for the geriatric population might be higher than that of ordinary care, Bunn presented no evidence as to the standard of care owed to a person in Ms. Jenkins' condition. Ms. Perrin testified that she asked Ms. Deen whether Ms. Jenkins had fallen in the shower because: "I figured out that something is wrong with the leg and I didn't know what was going on." However, nothing brought out in her testimony, or anyone else's testimony, created a reasonable inference that Ms. Jenkins had fallen while unattended, or that Ms. Deen had dropped her.

■ At the conclusion of the evidence put on by Bunn in the trial court, two theories had been posited as to the cause of Ms. Jenkins' injury: (1) an impact and twisting of unknown origin; and (2) the poor quality and condition of Ms. Jenkins' bones. Even assuming that these causes were "equally probable, there must be evidence which will permit the jury to eliminate [one of] them...." or there must be "enough [evidence] ... to permit a finding as to the greater probability." PROSSER AND KEETON ON TORTS, 249, (5th ed. 1984). Based on the evidence presented in this case, a jury could not reasonably infer that the impact and twisting were caused by

the negligence of appellee because there was no credible evidence to that effect.

■ Even assuming that an unknown impact and twisting factor caused Ms. Jenkins' injury, we have previously held that: "When plaintiff relies on circumstantial evidence to establish causation as an element of *res ipsa loquitur*, the evidence must make plaintiff's theory reasonably probable, not merely possible, and more probable than any other theory based on the evidence." *Quin, supra*, at 585 (referencing *Palleson v. Jewell Coop. Elevator*, 219 N.W.2d 8, 13 (Iowa 1974)). Without any facts concerning the impact and twisting, Bunn's theory as to the cause of the impact and injury rested on possibilities, not probabilities, even though Dr. Grant testified that the injury probably would not have resulted from Ms. Jenkins' normal activities. A jury would have to engage in conjecture and speculation as to the source of the impact and twisting which Dr. Grant believed caused the injury, and the amount of force and twisting necessary to produce a spiral fracture. Such speculation and conjecture are not permitted. *See Jones v. Safeway Stores, Inc.*, 314 A.2d 459, 460–61 (D.C.1974).

A jury would not have to engage in conjecture and speculation with regard to the second theory as to the occurrence of Ms. Jenkins' fracture. Based on her medical history, the fixed position of her legs and her inability to walk, the osteopenic condition of her bone, the taking of a medication which can weaken the bones, and the inability of her bones to retain a metal plate after surgery, it is reasonable to conclude that a fracture of her bones may ordinarily occur in the absence of negligence.

Accordingly, we see no error in the grant of USHCS's motion for a directed verdict because Bunn failed to establish a *prima facie* case of negligence. *Billingsley, supra.*

We affirm the trial court's ruling, and hence do not reach the issue as to whether Dr. Grant's testimony should have been stricken.

*Affirmed.*