*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CV-1187

SYLVIA PEARSON, PERSONAL REPRESENTATIVE, ESTATE OF BARRY MICHAEL PEARSON AND INDIVIDUALLY, APPELLANT,

V.

MEDSTAR WASHINGTON HOSPITAL CENTER, INC., *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2022-CA-001213-M)

(Hon. Maurice A. Ross, Trial Judge)

(Argued December 2, 2025                    February 19, 2026)

*George L. Garrow, Jr.* was on the brief for appellants.

*Janet A. Forero*, *Jared M. Green*, and *Peter R. Naugle* were on the brief for appellee MedStar Washington Hospital Center, Inc. and *Edward A. Gonsalves* and *Joseph W. Damiano* were on the brief for appellees Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and Mid-Atlantic Permanente Medical Group, P.C.

Before EASTERLY and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

Opinion for the court by *Associate Judge* Easterly.

Concurring opinion by *Senior Judge* Thompson at page 26.

EASTERLY, *Associate Judge:* Barry Michael Pearson, a Kaiser Permanente patient, was admitted to MedStar Washington Hospital Center in late September 2019 after suffering chest pains. He never left the hospital and died three months later. As documented in his autopsy report, at the time of death, he had a "large deep sacral ulcer (15x14 cm, 2.3 cm in depth)." His widow and the personal representative of his estate subsequently sued the hospital and all of his medical care providers for negligence and medical malpractice based on her claim that the development of this Stage 4 ulcer (the most severe) while Mr. Pearson was hospitalized had led to his suffering and eventual death, as well as for lack of informed consent.[1] In support of her negligence/medical malpractice claims (which overlapped entirely), Ms. Pearson alleged in her complaint that MedStar and Kaiser had breached the standard of care in a variety of ways, including by failing to provide "accurate and complete weekly skin audits"; "adequate and appropriate wound care"; and "adequate turning and repositioning of Mr. Pearson in order to provide pressure relief." But in response to defendants' motions for summary judgment and to exclude her expert testimony (in which they argued that to the extent Ms. Pearson sought to pursue a theory of res ipsa loquitur that theory also failed), Ms. Pearson

---

[1] Ms. Pearson also pled claims of wrongful death, survival, loss of consortium, and punitive damages, but these claims were derivative of her negligence/medical malpractice and lack of informed consent claims.

adopted a res ipsa loquitur theory—i.e., she asserted that a factfinder could infer negligence solely from the fact that Mr. Pearson developed a Stage 4 ulcer while hospitalized.

At a hearing on MedStar's and Kaiser's motions, the Superior Court observed that Ms. Pearson's experts (who had written their reports and been deposed before she adopted a new theory of the case) had stated that such ulcers could occur in some circumstances in the absence of negligence. The court then said it was "not giving [Ms. Pearson] res ipsa" because that doctrine "doesn't apply here." As for the lack of informed consent claim, the court expressed skepticism, asking: "informed consent as to what[;] . . . do[es the hospital] have to tell people . . . even if you come in [to the hospital] and you think it's going to be overnight, . . . you may develop" a pressure ulcer "if you're here for an extended stay"? The Superior Court subsequently issued three two-page orders, without explaining its reasoning in which it granted MedStar's and Kaiser's motions to exclude Ms. Pearson's experts and for summary judgment.

On appeal, Ms. Pearson abandons her original negligence claim based on her theory that MedStar and Kaiser breached the standard of care.[2] Instead she argues

---

[2] Accordingly, her allegation that MedStar and Kaiser breached the standard of care by failing to take certain actions, such as regularly repositioning Mr. Pearson, *see post* at 25, 27, 31, n.1-2, is no longer pertinent to our review.

that the Superior Court (1) erred (a) in rejecting the application of the res ipsa loquitur doctrine to her case, (b) in failing to consider MedStar's and Kaiser's res ipsa loquitur liability under the theory of apparent or ostensible agency, and (c) in dismissing her lack of informed consent claim, and (2) abused its discretion in excluding the testimony of her experts at the summary judgment stage. If we thought the summary judgment inquiry turned on whether Ms. Pearson's expert testimony was admissible, the absence of any explication by the court as to why it granted MedStar's and Kaiser's motion to exclude this testimony might require a remand.[3] *See Oji Fit World, LLC v. District of Columbia*, 325 A.3d 392, 406 (D.C. 2024) ("A trial court's failure to explain . . . a nonobvious exercise of discretion generally requires a remand, particularly when it prevents adequate appellate review of the basis of its holding." (quoting *Long v. United States*, 312 A.3d 1247, 1269 (D.C. 2024)). But we sidestep any consideration of remand because, based on our de novo review, we conclude that summary judgment for MedStar and Kaiser was warranted

---

[3] At the hearing, the Superior Court observed that the "reliability [of Ms. Pearson's expert testimony] is certainly shaky," without elaboration; but later the court appeared to analyze the res ipsa loquitur issue as if this expert testimony were admissible. In a discussion of whether the parties might still be able to reach a settlement, the court told Ms. Pearson's counsel that "the problem I see is that we're at the end of discovery, and it's all conclusory, and even the experts [sic]." In a discussion of why it would not entertain further argument on the merits after the submission of a proposed order, the court observed that "most of the experts' opinion just reject[s] the medical record."

even if we assume Ms. Pearson's expert testimony was admissible. *See id*. at 403

(explaining that we review summary judgment rulings de novo). More specifically,

even considering the expert evidence, Ms. Pearson failed to demonstrate that she had

triable negligence/medical malpractice claims based on the doctrine of res ipsa

loquitur,[4] and she likewise failed to substantiate her lack of informed consent claim

with the requisite expert testimony.[5] Accordingly we affirm the Superior Court's

grant of summary judgment to MedStar and Kaiser.

## I. Res Ipsa Loquitur

The doctrine of res ipsa loquitur is a rule of evidence that allows a plaintiff in

a negligence suit to ask the factfinder to infer negligence based on the mere

occurrence of an adverse event. *Bunn v. Urb. Shelters and Health Care Sys., Inc.*,

---

[4] As noted above and as she confirmed at oral argument, Ms. Pearson invoked the theory of ostensible agency to supplement her res ipsa loquitur claim. Thus, we need not address this theory if we conclude, as we do here, that her res ipsa loquitur claim fails.

[5] The Superior Court's statements at the hearing explaining why it thought summary judgment could be granted on the claims of res ipsa loquitur and lack of informed consent were only slightly less opaque than its expert testimony ruling. Rule 56(a)(1) provides that courts "should state on the record the reasons for granting . . . the motion," and this court has observed that a "statement of the trial judge's legal views [is] helpful," particularly where "a motion is based on several discrete contentions and the order does not disclose the specific ground on which the court ruled." *Doggett v. McLachlen Bancshares Corp.*, 663 A.2d 511, 514 (D.C. 1995). That said, we have also recognized that "there is no requirement that the trial court set forth its reasoning when granting summary judgment." *Id*.

672 A.2d 1056, 1060 (D.C. 1996); *Quin v. George Washington Univ.*, 407 A.2d 580, 582 (D.C. 1979). In order to rely on this doctrine in a medical malpractice case, a plaintiff must show that the "consequences of professional treatment (1) ordinarily do not occur in the absence of negligence, (2) are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) are not due to any voluntarily action or contribution on the part of the plaintiff." *Quin*, 407 A.2d at 583.

Given that the res ipsa loquitur doctrine, when it applies, may relieve a plaintiff of the burden of proving the traditional components of a medical malpractice claim—"standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury," *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009)—this court has indicated that trial courts should be cautious in allowing plaintiffs to pursue this theory of liability. *Gubbins v. Hurson*, 885 A.2d 269, 282 (D.C. 2005) (explaining that "*[r]es ipsa loquitur* is not to be invoked lightly in any case, and particularly not where medical malpractice is claimed" (emphasis in original)). "Due to the 'great variety of infections and complications which, despite all precautions and skill, sometimes follow accepted and standard medical treatment,' an inference of negligence [under this doctrine] cannot be based solely on the fact that an adverse result follows treatment." *Quin*, 407 A.2d at 583 (citation modified). Rather, the

plaintiff must supply "a basis in the record or in common experience to warrant the inference" of negligence, *id.*, and if the case involves "complex medical procedures, or the exercise of professional skill and judgment," the plaintiff must present expert testimony. *Harris v. Cafritz Mem'l Hosp.*, 364 A.2d 135, 137 (D.C. 1976). Moreover, the plaintiff may put this theory of the case before the factfinder only if the plaintiff has demonstrated that negligence is "reasonably probable, not merely possible, and more probable than any other theory based on the evidence." *Gubbins*, 885 A.2d at 282 (quoting *Quin*, 407 A.2d at 585); *see also Bunn*, 672 A.2d at 1061 (stating that in order for a factfinder to consider res ipsa loquitur, the plaintiff must present "evidence which will permit the jury to eliminate [other probable causes of injury]" or "to permit a finding [that negligence was] the greater probability"); *see also, e.g.*, *Quin*, 407 A.2d at 584 (explaining that a plaintiff is not entitled to a res ipsa loquitur instruction where "two equally plausible conclusions were deducible").

We begin and end our analysis in this case with the threshold question under the res ipsa loquitur test: whether the "consequences of professional treatment . . . ordinarily do not occur in the absence of negligence." *Quin*, 407 A2d at 583. Specifically, we consider whether the expert evidence presented by Ms. Pearson established that it was "more probable than any other theory based on the evidence" that Mr. Pearson's development of a Stage 4 sacral ulcer over three months of hospitalization could only be attributable to negligence by MedStar or

Kaiser. *See Gubbins*, 885 A.2d at 282 (quoting *Quin*, 407 A.2d at 585). We conclude that Ms. Pearson's experts, Dr. Salvador R. Guerrero and Nurse Thureiyya K. Rodriguez, did not create a triable res ipsa loquitur case. Mr. Pearson undisputedly had multiple serious comorbidities that specifically diminished the health of his skin. But Ms. Pearson's experts opined in generalities that failed to account for any of Mr. Pearson's specific comorbidities. Further, they failed to respond to evidence presented by MedStar and Kaiser—in the form of testimony from Dr. Sherif Osman, who was board certified in both internal medicine and wound care, and medical literature from the National Pressure Injury Advisory Panel (NPIAP) that Dr. Guerrero and Nurse Rodriguez agreed was authoritative—that these comorbidities were the reason Mr. Pearson's sacral ulcer developed and worsened to a Stage 4 pressure injury. Indeed, when Ms. Pearson's experts were compelled in their deposition testimony to address how skin health could be affected by other diseases or medical conditions, they actually lent support to the conclusion that the development and worsening of Mr. Pearson's sacral ulcer was the product of his comorbidities—thereby undercutting any inference that his Stage 4 ulcer more probably occurred as a result of MedStar's or Kaiser's negligence.

Mr. Pearson's comorbidities were extensively documented in his medical records and in MedStar's and Kaiser's joint expert report by Dr. Osman, which

Kaiser attached to its summary judgment filings.[6]  Relying on Mr. Pearson's medical records, Dr. Osman explained that at the time Mr. Pearson was admitted to the hospital on September 19, 2019, he already had a "significant" medical history that included "asthma/COPD with chronic hypoxemia (on 2L oxygen at home), heart failure with preserved ejection fraction (EF 55-60%), paroxysmal atrial fibrillation, anemia, supratherapeutic INR, pulmonary fibrosis, and pulmonary hypertension," as well as "end-stage renal disease," requiring hemodialysis.  Dr. Osman then detailed how Mr. Pearson's condition deteriorated after he was hospitalized: Mr. Pearson "suffered a stroke in the first month of his admission" and stemming from this event he experienced a number of health complications, including "aspiration pneumonia, . . . dysphagia [difficulty swallowing], and declining nutritional status," and the need for "TPN [intravenous feeding] for nutrition"; he had "multiple episodes of hypotension [low blood pressure] requiring the administration of several vasopressors" [medication that increases blood pressure]; he "suffered several hypoxic episodes [inadequate intake of oxygen]"; he had gastrointestinal (GI) bleeds; and he "suffered from pulmonary hypertension (as a result of pulmonary fibrosis), which caused the right side of his heart to start to fail, causing a backup of fluid" and "had pleural effusion and grade 2 diastolic dysfunction."  By mid-October

---

[6] Although MedStar and Kaiser made Dr. Osman available for a deposition, there is no indication in the record that Ms. Pearson sought to depose him.

2019, his treatment team recognized that his condition was "dire" and that he would "never regain[ ] sufficient stability to be able to leave the hospital." By mid-December 2019, he was on "vent[ilator] support for respiratory failure" and could no longer tolerate hemodialysis. He died on December 24, 2019.

Dr. Osman acknowledged that Mr. Pearson experienced "skin failure" during the three months he was hospitalized and that "a stage 2 pressure injury on [his] sacrum was first identified on October 6, [2019]"[7] and "developed into a stage 4 wound over time."[8] But Dr. Osman opined that the development of Mr. Pearson's pressure ulcers while he was hospitalized were "unavoidable given his medical condition and multiple co-morbidities." Dr. Osman explained that Mr. Pearson "arrived [at] MWHC in poor medical condition," highlighting the fact that "[h]e had

---

[7] As evidenced by his medical records (which, along with Dr. Osman's report, MedStar and Kaiser also submitted to the Superior Court), by this time, Mr. Pearson had already been transferred to the ICU (on September 29, 2019) because of a GI bleed. He would return to the ICU two more times: on October 17, 2019—after which Mr. Pearson's medical records indicate that he was "actively dying and . . . unlikely to recover from his acute on (sic) chronic illness"—and on November 13, 2019.

[8] Mr. Pearson's medical records reflect that his ulcer was deemed a Stage 3 pressure injury on October 14, 2019, but by October 16, 2019, it reverted to Stage 2, after which it fluctuated between being denoted as "unstageable," a "deep tissue pressure injury," and Stage 2. The first date a Stage 4 pressure injury is documented in Mr. Pearson's medical records is December 10, 2019, a week before the family was told that Mr. Pearson was experiencing "multi-organ failure" and that "TPN [IV feeding] would not provide medical benefit at this point and could cause harm."

started hemodialysis in May 2019," had already been hospitalized subsequent to that date "due to congestive heart failure and renal failure," was readmitted "on September 19, 2019 after a new NSTEMI [Non-ST-Elevation Myocardial Infarction]"; and at that point had not been taking his blood pressure medications and his anticoagulants for an unknown number of weeks. Thereafter, he "had multiple sources of infection all related to his co-morbid issues." Dr. Osman concluded that Mr. Pearson's "multiple comorbidities contributed to and caused his hypoxia [insufficient oxygen to his bodily tissues]" which in conjunction with his "poor nutritional status [and] dysphagia . . . contributed to the development of multiple, unavoidable pressure ulcers."

Dr. Osman further opined that Mr. Pearson was "appropriately managed and treated for his wounds/ulcers," noting that orders were given for "wound care management, consultation by infectious disease physicians, and consultation and treatment by physicians in plastic surgery and general surgery," but, this treatment notwithstanding, Mr. Pearson's "physical condition precluded the ability of his sacrum to heal" while he was hospitalized. Dr. Osman listed at least eight (he counted to nine but skipped number five) "co-morbidities which rendered the appropriate treatment of [Mr. Pearson's] ulcers unsuccessful":

First, Mr. Pearson had recurrent hypoglycemia, requiring him to get a high concentrated IV of sugar. Blood sugar is the body's currency, and when blood sugar levels are low, metabolism is low. When metabolism is low, the body's skin tissues are not getting adequate nutrition, and adequate nutrition is necessary for the proper healing of wounds.

Second, Mr. Pearson suffered from pulmonary fibrosis, which resulted in low oxygenation. This low oxygenation to Mr. Pearson's body was yet another severe hit to his skin, as the body's tissues need proper oxygenation levels to promote and sustain wound healing.

Third, Mr. Pearson suffered several hypoxic episodes due to his aspiration pneumonia, which further aggravated his low oxygen saturation and required several intubations. This low oxygenation level disrupted the body's ability to properly heal [his] wounds.

Fourth, Mr. Pearson had gastrointestinal (GI) bleeds during his hospital admission, which required copious

amounts of IV blood transfusions and IV fluids to maintain his blood pressure. The IV fluids were problematic because they resulted in severe edema. This edema increased the risk of tissue breakdown and decreased the ability of skin tissues to heal.

Sixth, Mr. Pearson suffered from pulmonary hypertension (as a result of pulmonary fibrosis) which caused the side of his heart to start to fail, causing a backup of fluid. This resulted in severe edema, which increased his risk of tissue breakdown and decreased the tissues' ability to heal.

Seventh, Mr. Pearson had pleural effusion and grade 2 diastolic dysfunction, which disrupted blood flow to the body, and made the perfusion of tissues more difficult.

Eighth, Mr. Pearson's GI bleeds resulted in difficulty with proper nutrition, so his nutritional stores were significantly diminished. Mr. Pearson's GI tract had slowed to the point where it could not absorb an adequate

amount of nutrition, and proper nutrition is necessary to facilitate the healing of wounds. Mr. Pearson's aspiration pneumonia only further complicated his feedings.

Ninth, Mr. Pearson's aspirational pneumonia required that his head of bed be elevated 45 degrees. As a result, Mr. Pearson was lying in bed in a position that put more pressure on his sacrum wound, which further increased the risk of tissue breakdown.

In addition to Dr. Osman's report, MedStar and Kaiser submitted to the Superior Court a 2011 article co-authored by the National Pressure Injury Advisory Panel (NPIAP) which documented that there was a general consensus among wound experts that "high-risk clinical situations can lead to unavoidable pressure ulcers" and more specifically that "unavoidable pressure ulcers may develop in patients who are hemodynamically unstable, terminally ill, have certain medical devices in place, and are nonadherent with artificial nutrition or repositioning."[9] Joyce M. Black, et al., *Pressure Ulcers: Avoidable or Unavoidable? Results of the National Pressure*

---

[9] This article was attached to their motion to preclude Ms. Pearson's expert testimony.

*Ulcer Advisory Panel Consensus Conference*, Ostomy Wound Management (February 2011) [hereafter NPIAP article[10]].

It is against the backdrop of Dr. Osman's report and the NPIAP article that we must consider the evidence Ms. Pearson presented to the court from Dr. Guerrero and Nurse Rodriguez to show the existence of triable issues of fact so as to defeat MedStar's and Kaiser's summary judgment motion. As we explain, this expert evidence did not come close to showing that Mr. Pearson's sacral ulcer *more probably* developed and worsened to Stage 4 as a product of negligence by MedStar or Kaiser because Dr. Guerrero and Nurse Rodriguez—both of whom claimed expertise only in wound care[11]—failed to grapple with Mr. Pearson's many documented comorbidities, either as a cause of Mr. Pearson's sacral ulcer or an aggravating factor that made Mr. Pearson's wound impossible to treat successfully.

---

[10] Ms. Pearson asserted in her Statement of Material Facts in Dispute filed in Superior Court that this article was "not authored or produced by the [NPIAP]." But the National Pressure Ulcer Advisory Panel (the old name for the NPIAP) is one of the eight co-authors listed. *See* https://perma.cc/5KKH-DK84.

[11] Dr. Guerrero was certified in wound management. He claimed "expertise[,] . . . training and experience in wound care," which he conducted in nursing homes, and explained that he had given up his board certification in general surgery about five years earlier because he "decided to do wound care 100%." Similarly, RN Rodriguez testified that she became a part-time consultant in "wound, ostomy, and continence (WOC) consulting" after she completed a WOC certificate course through Emory University.

First, we look to Dr. Guerrero's and Nurse Rodriguez's expert reports (both of which were submitted before Dr. Osman wrote his report and before Ms. Pearson elected to adopt a res ipsa loquitur theory of liability). Nowhere in their reports did Dr. Guerrero or Nurse Rodriguez attempt either to deny that Mr. Pearson had multiple comorbidities that (as subsequently detailed by Dr. Osman) were specifically linked to skin failure or to explain that, notwithstanding these comorbidities, Mr. Pearson's Stage 4 ulcer was avoidable and thus was more probably the result of negligence. Dr. Guerrero's report vaguely referred to Mr. Pearson's "multiple comorbidities" only once in his discussion of the "violations of the standard of care." And Nurse Rodriguez mentioned them not at all.[12]

That said, both Dr. Guerrero and Nurse Rodriguez noted in their expert reports that the "Centers for Medicare and Medicaid Services (CMS) has deemed Stage 3 or 4 pressure ulcers acquired after admission to a health care facility a 'Never Event' and a Hospital-Acquired Condition (HAC) for which billing CMS for reimbursement is prohibited." Setting aside the question whether a document meant

---

[12] Thus, any suggestion that Dr. Guerrero and Nurse Rodriguez claimed, in their reports, experience treating patients with Mr. Pearson's specific comorbidities, *see post* at 26 (stating that these experts cited "experience in pressure-injury prevention and treatment of skin and wound conditions in patients 'such as Mr. Pearson'"), is unfounded. Rather both indicated that they had experience taking care of patients with pressure ulcers "such as Mr. Pearson" or "as experienced by Mr. Pearson."

to address medical billing practices can supply proof that an injury would not have occurred absent medical negligence, neither expert acknowledged that the "Never Event" label is something of a misnomer because, as explained in the CMS factsheet Ms. Pearson submitted to the Superior Court, the CMS itself states that "never events" are "*[u]sually* [p]reventable – recognizing that some events are not always avoidable, given the complexity of health care" (emphasis added). *See Stuck v. Miami Valley Hosp.*, 141 N.E.3d 290, 301 (Ohio App. 2 Dist., 2020) (noting that the term "never event" comes from the Medicare and Medicaid billing context and no court "appears to have concluded that the occurrence of a 'never event' amounts to negligence per se or otherwise alters the proof that a plaintiff must present" in a negligence action).

After they wrote their reports, Dr. Guerrero and Nurse Rodriguez were deposed. But as with their reports, much of their deposition testimony sought to explain how MedStar and Kaiser had breached the standard of care because, for example, Mr. Pearson had not been given the right mattress or the correct medication, or had not had his ulcer attended to in the operating room. It was in this context that they made broad assertions that someone like Mr. Pearson, who was "high risk" for pressure injuries, should have been given special care; that "all pressure ulcers are preventable"; and that it was a breach of the standard of care if a healthcare provider failed to "maintain skin integrity." They also continued to

maintain, as they had in their reports, that Stage 3 and 4 pressure ulcers were categorically "never events" under CMS billing guidelines, still without acknowledging that the guidelines themselves expressly state "that some events are not always avoidable, given the complexity of health care." And even though they both indicated that they had reviewed Dr. Osman's report, they never specifically addressed any of the eight comorbidities that Dr. Osman had identified as reasons Mr. Pearson experienced skin failure, much less made any assertion that, these specific comorbidities notwithstanding, the development of Mr. Pearson's sacral ulcer and its failure to heal was more probably the product of negligent care.[13]

To the contrary, Dr. Guerrero and Nurse Rodriguez provided testimony that aligned with the views of Dr. Osman and the article by NPIAP—which they both agreed was an "authoritative source"—that skin failure and pressure ulcers could arise and worsen absent negligence.

For example, Dr. Guerrero agreed that "hemodynamic instability," i.e., low blood flow, "is one condition that can lead to an unavoidable pressure ulcer," and he acknowledged that Mr. Pearson "went through several periods of hemodynamic

---

[13] When Dr. Guerrero asserted, "I see this everyday in the nursing homes," *see post* at 26, he was referring to "pressure ulcers" generally. As noted above, at no point did he say that he had seen wound-care patients with Mr. Pearson's comorbidities.

instability" "[t]hroughout his stay from the date of his admission to the date of his death." The NPIAP article not only identifies hemodynamic instability as a cause of unavoidable ulcers, it also explains that there was 100% consensus among NPIAP panelists that "hemodynamic instability . . . [can] make a pressure ulcer unavoidable." And Dr. Osman documented that Mr. Pearson had "multiple episodes of hypotension [low blood pressure]" and then opined that his "pleural effusion and grade 2 diastolic dysfunction . . . [which] disrupted blood flow to the body" and his GI bleeds during his hospital stay which "required copious amounts of IV blood transfusions and IV fluids to maintain his blood pressure" impeded his sacral ulcer from healing.

For her part, Nurse Rodriguez testified that pressure injuries are the result of lack of blood flow to the skin and acknowledged that there might be "other factors that probably would relate [to blood supply to the skin], but it would have to be based on whatever is going on with the patient." After attempting to resist elaborating on what these other factors might be—she stated that she had only "c[o]me to opine on pressure injuries," not "about all different types of comorbidities"—she acknowledged that diabetes and anemia, among other conditions, diminish blood supply to the skin. And she also testified that malnutrition affects "tissue tolerance," which she identified as the ability of the skin to get adequate oxygen and blood flow, which in turn she explained was necessary for "healthy skin integrity." As noted in

Dr. Osman's report, Mr. Pearson was diagnosed with anemia upon admission to the hospital, and Dr. Osman identified Mr. Pearson's "recurrent hypoglycemia" as well as his difficulty in obtaining proper nutrition because of his GI bleeds as reasons his "skin tissues [were] not getting adequate nutrition" and his ulcer could not heal.

Lastly, both experts acknowledged that some ulcers are unavoidable at the end of life. Dr. Guerrero admitted that "[e]xtreme failure changes" can occur when the standard of care is met "when somebody is already dying"—as Mr. Pearson was documented to be as early as October 19, 2019, well before he developed a Stage 4 pressure ulcer, *see supra* n.7-8. And Nurse Rodriguez testified that "the skin can fail if . . . the patient is terminal." Neither acknowledged, much less contested, that Mr. Pearson's medical records reflect that he was "actively dying" as of October 18, 2019. And their testimony that Mr. Pearson's sacral ulcer was not a terminal ulcer because such ulcers appear only within hours, or at most days, of death was contradicted by the NPIAP article's explanation that "patients with these wounds sometimes die in a matter of hours and sometimes live for more than 6 weeks."

In short, this was not a case of truly competing experts on the issue of res ipsa loquitur, much less a case in which Ms. Pearson's expert evidence demonstrated that it was more probable that Mr. Pearson's sacral pressure ulcer was the product of negligence than that it was the inevitable result of his many comorbidities that

compromised his skin health. *See Gubbins*, 885 A.2d at 282. And because Ms. Pearson failed to carry her burden under our case law to show that there was a triable issue under the first step of the test for res ipsa loquitur, *see id.*, we uphold the court's ruling granting summary judgment to MedStar and Kaiser on Ms. Pearson's negligence and medical malpractice claims.

## II. Informed Consent

Ms. Pearson also sued MedStar and Kaiser for lack of informed consent related to Mr. Pearson's "long-term hospitalization." Specifically, she alleged that MedStar and Kaiser "failed to disclose the reasonably foreseeable risks with respect to their management of the long-term hospitalization experienced by Mr. Pearson," namely, the risk that he might develop "a hospital-acquired injury such as a pressure sore that could become infected and cause serious injury and death." As before, we review the Superior Court's summary judgment ruling on this claim de novo. *Miller-McGee v. Wash. Hosp. Ctr.*, 920 A.2d 430, 434 n.5 (D.C. 2007).

The "[f]ailure to obtain informed consent is a variety of medical negligence," which is based on a medical provider's failure to disclose material risks from a proposed treatment. *Dennis v. Jones*, 928 A.2d 672, 676 (D.C. 2007). When there is a material risk, the medical provider has a duty to disclose "the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures,

and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Miller-McGee*, 920 A.2d at 440 (quoting *Crain v. Allison*, 443 A.2d 558, 562 (D.C. 1982)). To prove a breach of this duty and "prevail in an action based on a theory of informed consent, the plaintiff must prove [1] that if he had been informed of the material risk, he would not have consented to the procedure and [2] that he had been injured as a result of submitting to the procedure." *Id.* at 439; *accord Dennis*, 928 A.2d at 676.[14]

As this discussion of informed consent indicates, the animating principle of this claim is that a patient should have sufficient information about the risks of a proposed treatment and its alternatives to make an intelligent choice "to determine what shall be done with his own body." *Miller-McGee*, 920 A.2d at 439 (quoting *Crain*, 443 A.2d at 561); *see also Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972) (explaining that the foundation for an informed consent claim is the understanding that "it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie"); *see also Crain*, 443 A.2d at 562 (agreeing with the "decision and . . . rationale" of *Canterbury*).

---

[14] We have alternately framed this test as requiring proof that (1) "there was an undisclosed risk that was material," (2) "the risk materialized, injuring [the] plaintiff," and (3) "[the] plaintiff would not have consented to the procedure if she had been informed of the risk." *Miller-McGee,* 920 A.2d at 440.

Examining Ms. Pearson's informed consent claim, we immediately encounter some difficulty because it is not at all obvious when MedStar and Kaiser themselves knew that the "treatment" they were providing to Mr. Pearson was "long-term hospitalization," thereby triggering their disclosure duties. Ms. Pearson did not identify this date either in her filings in Superior Court or in her briefs to this court. At oral argument, counsel for Ms. Pearson argued that MedStar and Kaiser "knew or should have known" at the time of admission that Mr. Pearson would be hospitalized long term. But there is no evidence in the record of any sort to support this assertion, much less any expert testimony. *See Canterbury*, 464 F.2d at 792 ("[M]edical facts are for medical experts."). Before a duty can be imposed on a medical professional to advise a patient about the risks attending a particular treatment and obtain the patient's consent, there must be some evidence that the professional knows they are offering the particular treatment for which informed consent is needed. *See Street v. Upper Chesapeake Medical Ctr. Inc.*, 260 Md. App. 636, 665 (2024) (recognizing that the informed consent doctrine applies "only in the context of *some treatment proposed by the health care provider*" (emphasis in original) (quoting *Reed v. Campagnolo*, 332 Md. 226, 241 (1993))).

Certainly, one might say that there came a point when Mr. Pearson's hospitalization became "long-term." But whenever that was, and on the assumption it triggered a duty to obtain Mr. Pearson's informed consent to this treatment, Ms.

Pearson faces another problem: she failed to present expert testimony that Mr. Pearson had a choice to undergo a treatment with material risks—long-term hospitalization—or to opt to do something else, perhaps to choose a different treatment or to decide to forgo treatment altogether. *Miller-McGee*, 920 A.2d at 440 (explaining that expert testimony is "required to establish the nature of the risks inherent in a particular treatment, the probabilities of . . . success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to the patient").

In her brief to this court, Ms. Pearson acknowledged that, because of his many health challenges, the choice for Mr. Pearson was not between remaining in the hospital and simply going home. She argued that, had Mr. Pearson been told of the risks, he "would have foregone the lengthy hospitalization and sought alternative treatment" in the form of "transfer[] to a skilled nursing facility." But Ms. Pearson's experts did not provide support for the proposition that this alternate form of treatment presented a lesser risk of injury, i.e., that Mr. Pearson was less likely to develop pressure ulcers in a "skilled nursing facility" than in a hospital.[15] Quite to the contrary. As noted above, Ms. Pearson's experts took the position in both their

---

[15] One might also view this as a failure to present the requisite expert testimony as to causation, i.e., that Ms. Pearson failed to prove that the cause of Mr. Pearson's pressure ulcer was his unconsented to long-term hospitalization and not the fact that he was bedridden because he was seriously ill and dying.

expert reports and their deposition testimony that Mr. Pearson was at a "high risk" for pressure ulcers. *See supra* Point I. And when asked, "[i]s there a substantial difference between wound care prevention and treatment whether the wound is at a hospital or in a nursing home," Dr. Guerrero answered "no."

Ms. Pearson suggested in her brief that her failure to supply the requisite expert testimony is attributable to MedStar and Kaiser because when Nurse Rodriguez "began to give her opinion" about whether Mr. Pearson should have been transferred "to a subacute rehabilitation facility, Defendants' counsel discontinued the line of questioning so the opinion could not be provided." But Ms. Pearson, as the plaintiff, bore the burden of proof, had the opportunity in the depositions to question her own witnesses, and in fact did pose questions to Nurse Rodriguez. If she wanted to try to elicit testimony from her to support her lack of informed consent claim, she could have done so.

Without expert testimony that there was a distinct risk to Mr. Pearson from long-term hospitalization as opposed to care in a skilled nursing facility, there was no foundation for a factfinder to conclude that MedStar and Kaiser breached their duty of disclosure.[16] *See Miller-McGee*, 920 A.2d at 440; *see also Abbey v. Jackson*,

---

[16] Ms. Pearson also alleged in her complaint that MedStar and Kaiser "failed to disclose the seriousness of the pressure sore, and the fact that it was far worse tha[n] they shared with Mr. Pearson and his family," but we do not understand this

483 A.2d 330, 332 (D.C. 1984) ("Expert testimony is necessary to establish the nature and degree of the risks of the proposed and alternate treatments."). Accordingly, we affirm the Superior Court's ruling granting MedStar and Kaiser summary judgment on Ms. Pearson's informed consent claim.

*          *          *

For the reasons stated above, we affirm the judgment of the Superior Court.

*So ordered*.

THOMPSON, *Senior Judge*, concurring in the judgment: This is an unfortunate case in which the decedent, Mr. Pearson, developed a massive and truly horrifying-to-view Stage 4 sacral pressure wound during his hospital stay. The summary judgment record includes testimony by Mr. Pearson's wife that, during her hours-long visits to him while he was hospitalized, no one came to reposition him. Ms. Pearson's amended complaint alleges negligence, including a "failure to provide adequate turning and repositioning of Mr. Pearson in order to provide pressure relief" and to provide "pressure relief devices to Mr. Pearson in sufficient time to prevent the formation and worsening of pressure injuries." But rather than focus

---

allegation to state a claim of lack of informed consent, *see supra*, and in the absence of any argument that this assertion both was meant to state a separate basis for liability and was improperly rejected by the court, we decline to address it.

primarily on "specific acts of negligence," *Quin v. George Washington Univ.*, 407 A.2d 580, 582 (D.C. 1979), Ms. Pearson relied heavily on the doctrine of res ipsa loquitur—"the thing speaks for itself"—to try to get to a jury on the issue of negligence.

For a reason I shall explain, I ultimately agree with my colleagues in the majority that the reports and testimony of Ms. Pearson's experts (former general surgeon and board-certified wound management physician Salvador Guerrero and wound nurse Thureiyya Rodriguez, who holds a doctorate in health care administration) failed to establish that the res ipsa doctrine was applicable on the record in this case. However, in my view, the problem is not, as the majority opinion suggests, that the Pearson experts "failed to respond to evidence presented by MedStar and Kaiser." *Ante* at 8. Dr. Sherif Osman, a physician board certified in internal medicine and wound management and the expert jointly retained by MedStar and Kaiser, opined in detail about why comorbidities such as those Mr. Pearson suffered make it difficult for pressure injuries to *heal*, increase the risk of skin breakdown, and make tissue perfusion more difficult. The Pearson experts, who cited their experience in pressure-injury prevention and treatment of skin and wound conditions in patients "such as Mr. Pearson," opined that Mr. Pearson's injury and its progression to a Stage 4 wound could have been avoided had proper pressure relief techniques been followed and had the standard of care otherwise been

met. For example, Dr. Guerrero, who testified that "I see this everyday in the nursing homes," further testified that "[i]f all of the standards of care had been followed and had been instituted starting with the identification of Mr. Pearson's high risk with the multiple comorbidities[,] this [development of a pressure ulcer] would never have happened." Nurse Rodriguez agreed. The Pearson experts did not discuss point-for-point each comorbidity identified by Dr. Osman, and they did not claim expertise in the treatment of the various comorbidities. But their reports and deposition testimony show that they had reviewed Mr. Pearson's medical records, were aware of his comorbidities, and opined nevertheless that the pressure injury could have been prevented or cured when it was at an earlier stage if proper protocols had been followed. For example, Nurse Rodriguez explained that "when you have comorbidities[,] it does not mean that the skin is always going to break down," and that "when it comes to development of a pressure injury, it's because of pressure." Only in the most conclusory fashion did defense expert Dr. Osman state that Mr. Pearson's "*development* of wounds . . . was unavoidable" (emphasis added).

In light of the foregoing, I cannot agree with my colleagues that the Pearson experts' "evidence did not come close to showing that Mr. Pearson's sacral ulcer *more probably* developed and worsened to Stage 4 as a product of negligence." *Ante* at 14. The Pearson experts' reports and testimony were "some expert opinion that the event will not usually occur if due care is used" and thus were "a basis for

invoking the doctrine of *res ipsa loquitur*." *Derzavis v. Bepko*, 766 A.2d 514, 523 (D.C. 2000) (quoting *Harris v. Cafritz Mem'l Hosp.*, 364 A.2d 135, 137 (D.C. 1976)). I believe that reasonable factfinders considering the competing opinions of the parties' experts and also hearing, for example, testimony from Ms. Pearson about the caregivers' failure to reposition Mr. Pearson during her lengthy visits, could reasonably have drawn the inference (though they would not have been required to infer, *see Washington Hosp. Ctr. v. Martin*, 454 A.2d 306, 310 (D.C. 1982)) that negligence was "more probable than any other theory based on the evidence." *Quin*, 407 A.2d at 585.

The record contained more than the competing expert opinions, however. In their depositions, the Pearson experts acknowledged, as an "authoritative voice" regarding pressure ulcer prevention and treatment, the views of the National Pressure Ulcer Advisory Panel (now known as the NPIAP), set out in an article that is part of the record. As the majority opinion notes, there was a 100% consensus among panelists at that organization's conference on pressure ulcers that "not all pressure ulcers are avoidable" and that "hemodynamic instability that is worsened with physical movement" and "impaired perfusion"—conditions that were among Mr. Pearson's diagnoses—can "make a pressure ulcer unavoidable."

To be sure, the res ipsa doctrine may apply if there is expert testimony that the injury in question is one that "will not *usually* occur if due care is used," *Derzavis*, 766 A.2d at 523 (emphasis added) (quoting *Harris*, 364 A.2d at 137), or "*ordinarily* does not occur when due care is exercised," *Quin*, 407 A.2d at 583 (emphasis added), and the NPIAP conference consensus was that a pressure injury *can be* unavoidable in patients with those diagnoses, not that a pressure injury is always unavoidable in that situation. Moreover, the article states that "even though these patients represent very high risk, the development of the ulcer cannot be seen as inevitable." In addition, the article confirms that the term "unavoidable" is a term of art; an "unavoidable pressure ulcer" is one that "can develop even though the provider evaluated the individual's clinical condition and pressure ulcer risk factors; defined and implemented interventions consistent with individual needs, goals, and recognized standards of practice; monitored and evaluated the impact of the interventions; and revised the approaches as appropriate." In other words, the NPIAP article builds into the definition of "unavoidable" an assumption that standard-of-care protocols were followed, i.e., an assumption that there was no negligence. Helpful to Ms. Pearson's position, the article states that "[i]t cannot be predetermined that an unavoidable ulcer will develop."

But further, and most pertinent to the present discussion, the article cautions that "the decision about avoidability is made after the fact, *when the processes of*

*care can be evaluated.*" (emphasis added). This statement, endorsed by a body that the Pearson experts accept as authoritative, suggests that Ms. Pearson's burden was to offer sufficient evidence from which the "processes of care c[ould] be evaluated." The statement explains why it did not suffice to avoid summary judgment for Ms. Pearson to rely on the presumption of negligence that the res ipsa doctrine supplies, and it causes me to conclude that the Superior Court did not err if it adjudged that a reasonable factfinder could not reasonably have drawn an inference of negligence from Mr. Pearson's injury alone. Without evaluating all the processes of care, the article suggests to me, the MedStar and Kaiser expert perhaps had an insufficient basis for stating that Mr. Pearson's pressure injury was unavoidable. At the same time, however, per the guidance of the entity the Pearson experts agree is the "gold standard," Ms. Pearson, who had the burden of proof to establish negligence and causation, needed to prove that repositioning and/or other standard-of-care protocols were neglected; it was not enough to rely on Dr. Guerrero's opinion that "if [repositioning every two hours] was in fact what was happening . . . , then Mr. Pearson wouldn't have developed that . . . progression to . . . , a Stage 4." In other words, at the post-discovery, summary judgment stage, Ms. Pearson needed to have marshaled adequate processes-of-care evidence to prove that Mr. Pearson's pressure wound was avoidable.

In opposing summary judgment, Ms. Pearson did set forth some of her specific evidence of alleged negligence (and I believe reasonable people might disagree about whether Ms. Pearson marshaled sufficient evidence of negligence to get to a jury). For example, Nurse Rodriguez reported from her review of the medical records that defendants failed to timely implement pressure-ulcer prevention strategies given Mr. Pearson's risk status, delaying such strategies until Mr. Pearson was "at-risk for friction and shearing"; and further that nursing notes showed inconsistent following of wound-care treatment orders (specifically, that there had been a lack of "consistency in their turning and repositioning" of Mr. Pearson and further showed that several nurses were not following the protocol as to preventive dressings). On the other hand, some of Ms. Pearson's arguments opposing summary judgment appeared to try to shift to defendants a burden to show lack of negligence,[17] and the record reflects that Dr. Guerrero had not yet pinned down specific acts of negligence.[18] In any event, however, as the majority opinion notes, on appeal Ms. Pearson has not argued that her negligence/medical malpractice claims could succeed without reliance on the res ipsa doctrine. And because I

---

[1] For example, the opposition asserted that the defendants' "inconsistent documentation regarding a turning and repositioning schedule for Mr. Pearson makes it impossible for [d]efendants to contend that Mr. Pearson was being turned and repositioned as per a schedule in the medical records or nurse progress notes."

[2] At the time of his deposition, Dr. Guerrero had "just reviewed . . . briefly" whether defendants failed to reposition Mr. Pearson consistently.

conclude for the foregoing reasons that it was not error for the Superior Court not to allow the case to proceed under the res ipsa doctrine, I agree that we should not disturb the summary judgment order in favor of defendants/appellees.